UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EPSILON ELECTRONICS, INC.,
1550 South Maple Avenue
Montebello, CA 90640

        Plaintiff,

    v.

UNITED STATES DEPARTMENT OF THE
TREASURY,
OFFICE OF FOREIGN ASSETS CONTROL,
U.S. Department of Treasury
Treasury Annex
1500 Pennsylvania Avenue, NW
Washington, DC 20220

and

THE HONORABLE JACOB J. LEW,
SECRETARY OF THE UNITED STATES
DEPARTMENT OF THE TREASURY, in his
official capacity.
U.S. Department of Treasury
1500 Pennsylvania Avenue, NW
Washington, DC 20220

and

ADAM J. SZUBIN, DIRECTOR, OFFICE OF
FOREIGN ASSETS CONTROL, UNITED
STATES DEPARTMENT OF THE
TREASURY, in his official capacity.
U.S. Department of Treasury
Treasury Annex
1500 Pennsylvania Avenue, NW
Washington, DC 20220

        Defendants.

NO.

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF IN THE NATURE OF MANDAMUS AND OTHER APPROPRIATE RELIEF

Plaintiff Epsilon Electronics, Inc. ("Plaintiff" or "Epsilon"), by and through undersigned

counsel, pursuant to the Administrative Procedure Act, 5 U.S.C. § 706, and other appropriate

authority, hereby files this Complaint and petitions this Court to issue a Declaratory Judgment,

Injunctive Relief, or, alternatively, a Writ of Mandamus compelling the United States Department of Treasury, Office of Foreign Assets Control (OFAC), OFAC Director Adam J. Szubin, and Secretary of the Treasury Jacob J. Lew to declare the penalty imposed as unlawful and excessive, to issue a writ of mandamus to remove or reduce the fine as appropriate, and enjoin OFAC or other federal agencies from collecting civil penalties in accordance with applicable laws.  As explained herein, the penalties imposed against Epsilon by OFAC violate the Administrative Procedure Act, 5 U.S.C. § 701, et seq., because OFAC's penalty findings were arbitrary and capricious, and also violate the Eighth Amendment Excessive Fines Clause. Epsilon faces severe harm without declaratory and injunctive relief from this Court.

## PARTIES

1.      Plaintiff Epsilon Electronics, Inc., is a small, family-owned California corporation in the business of wholesaling automotive sound and video systems.

2.      OFAC is a federal agency within the United States Department of Treasury, located at 1500 Pennsylvania Avenue, NW, Washington, DC 20220.  OFAC is responsible for administering and enforcing economic and trade sanctions against targeted foreign countries and regimes.  OFAC enforces the Iranian Transactions and Sanctions Regulations ("ITSR"), 31 C.F.R. Part 560, which is a set of regulations codifying certain economic sanctions and embargoes against the Islamic Republic of Iran.

3.      Defendant Jacob J. Lew is Secretary of the Treasury.  Under Executive Order 12957, which implements the International Emergency Economic Powers Act, 50 U.S.C § 1701, et seq., the Secretary of the Treasury has the authority to impose regulations regarding sanctions on Iran.  This defendant is sued in his official capacity.

4.      Defendant Adam J. Szubin is the Director of the Office of Foreign Assets Control,

and is responsible under regulations for implementing and enforcing the ITSR.  This defendant is sued in his official capacity.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction of the subject matter under 28 U.S.C. § 1331, as this case arises under the laws of the United States and involves constitutional claims under the Fifth Amendment to the United States Constitution.  This Court also has subject matter jurisdiction under 28 U.S.C. § 1337, as this case arises under an Act of Congress regulating commerce. Jurisdiction is further permitted for this Court pursuant to 5 U.S.C. § 702 over causes of action arising under 5 U.S.C. §§ 702, 706.

6.     This Court has authority in this action to grant declaratory and injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure, the Mandamus Act, 28 U.S.C. § 1361, the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a), 2202, the Administrative Procedure Act, 5 U.S.C. § 706(2), and its inherent equitable powers.

7.     Venue in this District is proper under 28 U.S.C. § 1391(b) and (e), as the Defendants reside in this District.

## FACTS

8.     This case is about OFAC's allegations that Epsilon sold or directed its products to Iran.  The sales to Iran that are the subject of OFAC's scrutiny and concern were done by an independent company in Dubai, United Arab Emirates (U.A.E.) named Asra International Corporation, LLC, without Epsilon's permission.  Epsilon cooperated with several substantial administrative subpoenas, and acted in good faith to cooperate with OFAC's investigation. OFAC responded by failing to specify the basis for its penalty assessments in the prepenalty notice (PPN) it issued.  OFAC then disregarded the application of numerous mitigation factors

mandating the reduction of penalties pursuant to its regulations in 31 C.F.R. Part 501, Appendix A, Section III, and disregarded application of the "inventory exception", 31 C.F.R. § 560.204 (the regulations do not prohibit U.S. persons from shipping non-sensitive goods (Epsilon's products at issue) to a third country (the U.A.E.) even with knowledge that those goods may eventually end up in Iran in cases where Iran does not represent the majority of the buyer's (Asra's) business, and sales are not by the U.S. person to Iran (Epsilon did not sell to Iran.) (Explained informally in Guidance on Transshipments to Iran issued by OFAC on July 22, 2002; and explained more fully in this Complaint at II. U.S. Sanction Authority Regarding Iran, para. 32, and V.   Failure to consider mitigation factors, (B)(1)(i)), and assessed a grossly disproportionate penalty against Epsilon.

## I.      Background of Epsilon Electronics, Inc.

9.      Epsilon is a small business and wholesaler of automotive audio and video equipment and has been engaged in this business since 1987.

10.      Epsilon is a family-owned corporation founded by Mr. Jack Rochel and his father Mossa Rochel.  Epsilon presently employs 60 people, all in the United States.

11.      Mr. Jack Rochel is the current president and CEO of Epsilon.  Mr. Rochel is a U.S. citizen.

12.      Epsilon's primary place of business is 1550 South Maple Avenue, Montebello, California 90640.  Epsilon is a California corporation and was founded in January 1983.  Its state entity number is C1166759, and the business is in good standing.

13.      Epsilon also does business as Power Acoustik Electronics, Sound Stream, Kole Audio, Precision Power Audio, Farenheit Technologies, and SPL.

14.      Most of Epsilon's business involves the importation and resale of audio and video

equipment produced by manufacturers in China and South Korea.  Epsilon currently engages in both domestic and international sales, although the vast majority of its business, roughly 65-70% of sales, is domestic.  Latin America and Mexico currently represent approximately 80% of Epsilon's export market.

15.     Epsilon formerly did business with Asra in Dubai, U.A.E.

16.     Asra is a reseller of stereo and other audio and video equipment for automobiles, and operated in several Asia and African markets as a distributor for such equipment.

17.     Epsilon sold and exported products to Asra for resale in Dubai.

18.     Although Epsilon and Asra had prior agreements, Epsilon and Asra entered into a new agreement on February 1, 2012, whereby Asra became Epsilon's distributor in several markets in Asia and Africa.  Notably excluded from this agreement was permission to serve as distributor in any nations subject to United States sanctions.  A copy of this agreement is attached as Exhibit A.

19.     Following receipt of a cautionary letter, Epsilon attempted to investigate the situation and inquired of Asra whether it violated the distribution agreement by distributing Epsilon products to countries outside the distribution agreement without Epsilon's permission. Epsilon attempted to ensure that Asra was not in violation of any laws.

20.     If Asra did direct and re-export sound equipment to Iran, then it did so without Epsilon's consent.

21.     At no time did Epsilon consent or give permission for re-export or resale of its products to Iran or any Iranian affiliated entity.


## II.     U.S. Sanction Authority Regarding Iran.

22.     Iran has been subject to sanctions through a series of Executive Orders that began

with Executive Order 12613, which was issued on October 29, 1987, pursuant to authorities including the International Security and Development Cooperation Act of 1985 (22 U.S.C. § 2349aa–9).

23.     The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1705, grants to the President certain authorities that "may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared." Id. § 1701(b).  Those authorities include the authority to, "by means of instructions, licenses, or otherwise," investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States.  Id. § 1702(a)(1)(B).

24.     In Executive Order 12957, issued on March 15, 1995 (''E.O. 12957''), under the authority of, inter alia, IEEPA and the National Emergencies Act (50 U.S.C. 1601, et seq.) (''NEA''), the President created a policy of economic sanctions against Iran.

25.     It is unlawful for a person to violate any license, order, regulation, or prohibition issued under IEEPA. Id. § 1705(b)-(c).

26.     The primary U.S. federal government body responsible for administering U.S. sanctions laws and regulations against Iran is OFAC, which maintains various sanctions programs and regulations against countries such as Iran.

27.     OFAC has promulgated regulations to implement the above-noted Executive Orders.  The regulations are found in 31 CFR Part 560, the ITSR which bars the trade of nearly all goods, services and technologies between Iran and the United States, as well as investment and funds transfers.

28.     Under 31 CFR § 560.204 (Prohibited exportation, re-exportation, sale, or supply of goods, technology, or services to Iran), U.S. persons are prohibited from exporting most goods, services, and technologies if they know that those goods are specifically destined for re-exportation to Iran.

29.     Under 31 CFR Part 501, Appendix A (Economic Sanctions Enforcement Guidelines), OFAC bifurcates apparent violations in two ways, specifically (1) violations that are or are not voluntary self-disclosed (per the definition of Voluntary Self-Disclosure provided therein); and (2) violations that are egregious or non-egregious (determined by OFAC based on mitigating guidelines, detailed below).  Therefore there are effectively four types of violations under the ITSR.

30.     Under 31 CFR Part 501, Appendix A, Section III, in determining administrative actions OFAC looks to certain "general factors."  These are often referred to as the "mitigating factors" or "aggravating factors."  In other words, the facts surrounding these factors in a given case can lower the penalty.

31.     Under 31 CFR § 560.204, and an interpretation of what the law does not cover, U.S. persons can export goods to a third country knowing that such goods may go to Iran, provided, however, that (1) the goods are not subject to the Export Administration Regulations; (2) the U.S. person is not filling a specific order for export to Iran; and (3) the majority of the

buyer's business and sales are not to Iran.  This is explained more in Guidance on Transshipments to Iran, issued by OFAC on July 22, 2002.

### III.    OFAC's Investigation of Epsilon.

32.    OFAC's involvement in the case began on August 18, 2011 with an Administrative Subpoena (Case ENF 37795) from OFAC to Mr. Jack Rochel regarding a certain shipment by Epsilon in 2008.  A copy of this administrative subpoena is attached as Exhibit B.

33.    On December 14, 2011, OFAC sent a separate additional Administrative Subpoena to Mr. Rochel, as well as Epsilon's financial institution, Union Bank, N.A.  A copy of this Administrative Subpoena is attached as Exhibit C.

34.    Epsilon complied with these administrative subpoenas and produced all relevant documents to OFAC in response.

35.    OFAC issued Epsilon a Cautionary Letter on January 26, 2012, concerning sales of Power Acoustik, and made no mention of sales with Asra.  A copy of this Cautionary Letter is attached as Exhibit D.  At the time, this Cautionary Letter appeared to resolve all issues with OFAC's investigation.

36.    Despite resolving the matter through OFAC's issuance of a Cautionary Letter, on May 23, 2012, OFAC sent a new Administrative Subpoena to Epsilon.  A copy of this Administrative Subpoena is attached as Exhibit E.

37.    Epsilon, through its former counsel, complied with this new Administrative Subpoena, producing all number of relevant documents to OFAC in response.

38.     OFAC issued Epsilon a PPN, on May 9, 2014.  A copy of this notice is attached hereto as Exhibit F.  The PPN states that Epsilon violated the ITSR, and cites 34 non-egregious violations from August 26, 2008 to March 15, 2011, and five egregious violations from February 20, 2012 to May 22, 2012.

39.     In the PPN, OFAC identified Asra re-exports to Iran in a general, conclusory fashion, without presenting any evidence of this re-exportation or of Epsilon's knowledge that equipment might be re-exported.  Ex. F.

40.     Epsilon was not presented with any specifically cited incidents of re-export or instances of illegal behavior by itself or Asra in the PPN report.  Id.

41.     At the time, Epsilon was represented by prior counsel.  Prior counsel responded to the PPN on June 6, 2014, with a general denial that Epsilon violated the sanctions regulations and also citing that Epsilon's owners oppose the Iranian regime due to their Jewish heritage. A copy of this response to the PPN is attached as Exhibit G.

42.     In the PPN, OFAC cited to certain mitigating general factors to Epsilon's potential benefit, specifically (1) a "first offense" mitigation of up to 25%; (2) the fact that Epsilon is a small business; (3) the fact that Epsilon had offered some cooperation to OFAC, including tolling the Statute of Limitations (per a Tolling Agreement dated May 13, 2013 signed by Mr. Rochel).  Ex. F. at pp. 2-3.

43.     OFAC cited generally to several "General Aggravating Factors."  These include, inter alia, the charge that Epislon exported goods to Asra valued at $3,407,491 in the specified period.

**IV.     The Penalty Notice.**

44.     On July 21, 2014, a civil penalty in the amount of $4,073,000 was imposed upon Epsilon by OFAC.  A copy of this penalty notice is attached as Exhibit H.

45.     OFAC claimed authority to issue this penalty pursuant to 31 C.F.R. § 560.704. Ex. H.

46.     The OFAC notice was a final agency action under 31 C.F.R. § 560.704.  Id.

47.     The penalty notice cited several instances of alleged misconduct and misrepresentations by Epsilon.  Id.

48.     The penalty notice was the first instance where OFAC specified the alleged misconduct that gave rise to the violations.  See id.

**V.     Failure to consider mitigating factors.**

49.     OFAC failed in many instances to properly consider mitigating factors to reduce Epsilon's penalty.

50.     The guidelines that OFAC is required to consider are found in 31 C.F.R. § 560.704, which incorporates 31 CFR Part 501, Appendix A (Economic Sanctions Enforcement Guidelines).

51.     OFAC failed to consider all of the following listed and required mitigation factors, provided in 31 CFR Part 501, Appendix A, Section III, thereby resulting in an unconstitutional, excessive, and arbitrary and capricious, grossly disproportionate fine (excluded from the below list are those factors which are not applicable to Epsilon or those which Epsilon does not dispute the application or use of in the OFAC's penalty calculation; and as such, the lettered and numbered paragraphs below correspond directly with the lettered paragraphs pursuant to the mitigation factors found and provided in 31 CFR Part 501, Appendix A, Section

III):

### (A) Whether there was a Willful or Reckless Violation of Law

(i)     Epsilon did not willfully or recklessly violate the law.  The Company felt that it was exporting goods to the U.A.E. and as such that this was not prohibited under U.S. law as it was not an export to Iran.  This thought process demonstrates that the apparent violations cited by OFAC were not willful.  This position is further evidenced by the Company's lack of sophistication.  See Ex. A; Ex. D.

### (1) Recklessness

(ii)     Epsilon's behavior did not constitute recklessness.  Epsilon is a small company and its sale of goods to a company in the U.A.E. was by no means reckless.  The United States does very large trade with the U.A.E., and such trade exceeded $26 billion in 2013.  See Office of the United States Trade Representative, Executive Office of the President, U.S.-United Arab Emirates Trade Facts, found at http://www.ustr.gov/countries-regions/europe-middle-east/middle-east/north-africa/united-arab-emirates.  The U.A.E.'s business landscape is notably marked by a heavy U.S. diplomatic and economic presence – from small businesses to major U.S.-based international corporations.  Epsilon was doing what many other companies have been doing for years – exporting to the U.A.E.  The position arbitrarily assumed by OFAC is that all sales by Epsilon to Asra were for reshipment to Iran, when it is clear that Iran was one of many countries to which Asra reexports.

### (2) Concealment

(iii)     There is nothing to indicate that Epsilon concealed the facts here.  There is no reason or evidence OFAC used or raised to believe the Company falsified invoices or engaged in other suspicious activity to conceal any prohibited transaction.

### (3) Pattern of Conduct

(iv)     Although the alleged transactions were repetitive, they manifest that the Company thought it was engaging in what it considered to be legal activity, particularly the lack of concealment.

### (4) Prior Notice

(v)     The Company had little notice that exporting to the U.A.E. would be an issue, irrespective of whether the goods would be going to Iran or not.

### (5) Management Involvement

(vi)     Mr. Jack Rochel and Mr. Sohail Rochel were the sole owners and sole parties with knowledge of these sales and as such the other partners were largely unaware.

### (B) Awareness of Conduct at Issue

### (1) Actual Knowledge

(i)     The Company did not know that any transshipments to Iran of goods it exported to the U.A.E. would constitute a violation.  Indeed, due to the drafting of the regulations, U.S. persons can under certain circumstances ship non-sensitive goods to a third country knowing that some of the goods may eventually wind up in Iran.  This is contingent upon (i) Iran not representing the majority of the counterparty's business; and (ii) the U.S. person not filling specific orders for Iran.

### (2) Reason to Know

(ii)     The issue of "reason to know" rests on whether the shipments by Epsilon to Asra were really destined exclusively for Iran, which is the arbitrary conclusion of OFAC .

### (3) Management Involvement

(iii)     Epsilon is a family company with unsophisticated family ownership and lower-level employees.

### (C) The Harm (if any) to Sanctions Programs Objectives arising from the alleged violation(s)

#### (1) Economic or Other Benefit to the Sanctioned Individual, Entity, or Country

(i)     The economic benefit conferred on the Iranian economy from any indirect sales of audio products is generally minimal.  Notably, comparable audio products from Southeast Asia are considered to be widely available in Iran, and the technologies do not represent a field subject to U.S. technological dominance. Furthermore, given that Epsilon's products are Chinese-made, nearly identical products (under different names and companies, of course) could be going to Iran as of now.  Importantly, the scale of goods that may have gone to Iran is largely minimal.

#### (2) Implications for U.S. Policy

(ii)     The sales of such goods indirectly to Iran do not have any solid implications for U.S. policy.  Although direct sales of such goods are prohibited under the ITSR, there is the "inventory exception", which applies in this case to Epsilon and serves to mitigate any penalty. This exception is not explicitly written in the ITSR but by definition of the scope of what the ITSR does <u>not</u> cover.  Specifically, 31 CFR § 560.204 (Prohibited exportation, reexportation, sale, or supply of goods, technology, or services to Iran) states that:

> Except as otherwise authorized pursuant to this part, and notwithstanding any contract entered into or any license or permit

13

granted prior to May 7, 1995, the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited, including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that:

(a) Such goods, technology, or services are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran; or

(b) Such goods, technology, or services are intended specifically for use in the production of, for commingling with, or for incorporation into goods, technology, or services to be directly or indirectly supplied, transshipped, or reexported exclusively or predominantly to Iran or the Government of Iran.

Id.

(iii)    The general caveat behind this principle is that goods cannot be specifically shipped to a third country for reshipment to Iran.  Further the goods cannot be subject to the U.S. Export Administration Regulations for being "dual-use."  The term "dual use" refers to items that may have both a commercial and military use, such as a very high-speed computer microchip.  See 15 CFR § 772.1 (2014).  OFAC in its PPN of May 9, 2014 states that "….Asra, a company with offices in Tehran, Iran, and Dubai, U.A.E., that reexports most, if not all, of its products to Iran.  Epsilon knew or had reason to know that such goods were intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran." Ex. F.  OFAC failed to consider the "inventory exception" and failed to apply it to Epsilon's case to mitigate any assessed penalty.  OFAC's failure to apply the "inventory exception" to Epsilon's case was artbitrary and capricious, and instead imposed a grossly disproportionate fine on Epsilon give the facts and mitigating factors present in this case.

14

**(D) The Individual Characteristics of the Alleged Offender**

**(1) Commercial Sophistication**

(i)      Epsilon is a modest operation whose earnings disproportionately project a large operation, however it does not do business in goods that have a "dual-use".  See 15 CFR § 772.1.

Although OFAC recognized the modest size and commercial sophistication of the company in calculating the penalty, it failed to fully, fairly or adequately calculate these facts as mitigating factors in levying the penalty.

**(2) Size of Operations and Financial Condition**

(ii)      The size of Epsilon's operations in question is negligible given the scale compared to Epsilon's international sales.  In all, of the invoices that OFAC categorized as egregious, only one to six pieces per model, were shipped to Dubai, and the sales to Asra represented less than 2% of Epsilon's sales in a given period.  This is a very small number of goods overall compared to the grossly excessive fine imposed on Epsilon by OFAC.

(iii)      Epsilon is currently in substantial debt, with a $6.9 million obligation to its bank under an existing line of credit it uses for operations.  Following issuance of the penalty and its publication, Epsilon's bank reduced its line of credit by fifty percent (50%) and shortened the repayment terms to only a few months.  This is a large debt for Epsilon, and the excessively gross OFAC penalty, coupled with the resulting change in its bank's terms adds particular undue hardship on Epsilon's ability to conduct business and its overall financial health.

(iv)      Epsilon's sales have dropped considerably as a result of the issuance OFAC penalty and its publication.

(v)      Epsilon has been forced to lay-off eleven (11) workers as of August 2014, largely due to the drop in business as a result of the OFAC investigation and fine.

### (3) Volume of Transactions

(iv)    The volume of transactions at issue is minimal given Epsilon's total sales volume. OFAC arbitrarily concluded that all sales to Asra were per se indirect sales to Iran without evidence to support such a sweeping determination.

### (4) Sanctions History

(v)    Epsilon has never been cited for an OFAC or other export violation in its thirty (30) years of existence.

### (E) The existence of a Compliance Program

(i)    Epsilon did not have a compliance program and was unfamiliar with such programs as it never contemplated doing business with a sanctioned country.

### (F) Remedial Response taken by the alleged violator following discovery that the apparent violation(s) is/are prohibited by law

(i)    The company retained counsel to defend itself, and disbanded its distribution agreement with Asra.  It also attempted to investigate the activity and it stopped any further transactions.

### (G) The alleged violator's cooperation with OFAC

(i)    Epsilon took steps to cooperate with OFAC, including responding to both subpoenas and agreeing to a Tolling Agreement with OFAC (signed by Jack Rochel on May 13, 2013), allowing OFAC to look at alleged violations that had passed the 5-year federal statute of limitations.

**(H) (Not Applicable)**

**(I) Any Other Enforcement Action against the Party**

(i)      The company had only received a Cautionary Letter previously from OFAC on January 26, 2012, which failed to mention any sales with Asra, only referred to sales with Power Acoustik, and stated that OFAC was closing the matter and considered it resolved.  Epsilon has had no prior enforcement action against it.  Ex. D.

**(J) The Future Compliance/Deterrence Effect of the Activities**

(i)      The penalty naturally has a deterrent effect, but the penalty is so severe that it creates undue harm and hardship to the company's financial health and is disproportionately excessive and arbitrary and capricious.  As discussed above as well, Epsilon is currently in substantial debt, with a 6.9 million obligation to its bank under an existing line of credit; its sales have dropped drastically as a result of the OFAC disproportionate penalty; and it has been forced to lay-off eleven (11) workers as of August 2014 due to the drop in business as a result of the excessive penalty.  Epsilon has also suffered great undue harm where upon learning of the excessive and disproportionate fine upon Epsilon, its bank changed the terms of its line of credit thereby reducing its credit by fifty percent (50%) and reducing its repayment cycle to only ninety (90) days.  These changes in the terms of its line of credit have greatly impacted Epsilon's ability to continue to do business and have resulted in a loss of business and increased corporate debt. Epsilon is now also unable to secure credit or other loans from any other bank as a result of this excessively large fine.  Epsilon's current customers and potential customers have also either cut

their business or are fearful of doing business with Epsilon as a result of the excessive and disproportionate fine, thereby causing a drop in sales that threatens to put Epsilon out of business.

### (K) Other relevant factors on a case-by-case basis

(i)      General Factors (A) through (D) are granted substantial weight in determining whether a case is egregious, with particular emphasis given to (A) and (B), pursuant to 31 CFR Part 501, Appendix A, Section V(B).

(ii)      Furthermore, in cases involving a first violation, the base penalty amount can be reduced by up to 25% pursuant to 31 CFR Part 501, Appendix A, Section V(B)(b).  This was Epsilon's first violation, and OFAC failed to reduce the base penalty fairly given the facts.

(iii)      Beyond the factors generally reviewed by OFAC it is critical to emphasize that Epsilon understandably relied exclusively on the assistance of prior counsel that it felt was capable in handling this case.  Prior counsel is a reputable firm, although Mr. Jack Rochel did not realize that the firm's reputation was in matters principally concerning taxation law, not on those concerning U.S. sanctions, a very sophisticated and esoteric area of law.  Given prior counsel's apparent unfamiliarity with this subject matter, the response given by that firm was woefully inadequate and unduly prejudiced Epsilon.  Regardless, OFAC had a duty under its regulations to apply the mitigating factors under the guidelines to reduce this penalty where applicable, but it failed to do so and issued a grossly excessive fine that is arbitrary and capricious and in violation of the Constitution and the Administrative Procedure Act.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

## VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 701, et seq.

52.     Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs with the same force and effect as though fully set forth herein.

53.     The penalty imposed against Plaintiff by Defendants is unlawful as arbitrary and capricious, violates a constitutional right against excessive fines, is unsupported by substantial evidence and unwarranted by the facts because it is completely disproportionate to the underlying facts and nature of the asserted violations.

## SECOND CAUSE OF ACTION

## VIOLATION OF THE EIGHTH AMENDMENT, EXCESSIVE FINES CLAUSE

54.     Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs with the same force and effect as though fully set forth herein.

55.     The $4,073,000 penalty imposed against Plaintiff is grossly disproportionate to the underlying facts, nature of offense, and number of asserted violations, and thus violates the Eighth Amendment ban on excessive fines under the Excessive Fines Clause.  A review of the underlying factors relevant to determining whether a penalty complies with the Eighth Amendment's prohibition on excessive fines makes clear that Defendants' imposition of such a large fine against Plaintiff is excessive and unlawful.

## THIRD CAUSE OF ACTION

## VIOLATION OF THE FIFTH AMENDMENT DUE PROCESS CLAUSE

56.     Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs with the same force and effect as though fully set forth herein.

57.     OFAC violated Plaintiff's Fifth Amendment right to due process under the United States Constitution by failing to provide notice of the specific allegations and transactions that would demonstrate that Plaintiff knowingly or willfully violated the ITSR, or otherwise was in violation of U.S. sanctions law, under 31 CFR § 560.204, until issuance of the final penalty notice.  Such conduct prevented Plaintiff from being able to offer a meaningful, specific, and substantial response to the charges of violations alleged by OFAC, and deprived Plaintiff of both notice and an opportunity to be heard in violation of Plaintiff's due process rights.

## DAMAGES

58.     The penalty is grossly and disproportionately an excessive fine and punishment, and it is arbitrary and capricious.  The penalty of 4 million dollars is so excessive and disproportionate that it creates undue harm and hardship to the company's ongoing financial health.  As discussed above, Epsilon is currently in substantial debt, with a 6.9 million dollar obligation to its bank under an existing line of credit; its sales have drastically dropped largely as a result of the penalty and its publication; and it has been forced to lay-off eleven (11) workers as of August 2014 due to the drop in business as a result of the penalty.  The excessive and disproportionate fine nearly doubles Epsilon's debt and has seriously impacted its ability to carry

on its normal course of business.  Epsilon has also suffered great undue harm where its bank, upon learning of the excessively large fine upon Epsilon, dramatically changed the terms of Epsilon's line of credit thereby reducing its credit by fifty percent (50%) and reducing its repayment cycle to only ninety (90) days.  These changes in the terms of its credit have greatly impacted Epsilon's ability to continue to do business and have resulted in a loss of business and increased debt.  Epsilon is now also unable to secure credit or loans from other banks as a result of this excessive and disproportionate fine.  Epsilon's current and potential customers have also either cut their business or expressed serious hesitation and delay in business with Epsilon as a result of the excessive and disproportionate fine, and thereby caused a drop in sales so severe that it threatens to put Epsilon out of business.

### PRAYER FOR RELIEF

WHEREFORE Plaintiff Epsilon requests the following relief:

i)       Declare, pursuant to the Court's authority under 28 U.S.C. §§ 2201(a) and 2202, that the penalty imposed by OFAC on Epsilon is unlawful and excessive in violation of the Administrative Procedure Act, and/or the Eighth Amendment, Excessive Fines Clause;

ii)      Issue a writ of mandamus ordering OFAC to remove the fine, or alternatively, to reduce the fine in accordance with 31 C.F.R. Part 560, Guidance On Transshipment To Iran, or to reduce the fine as deemed appropriate in accordance with the Eighth Amendment prohibition on excessive fines;

iii)     An order enjoining OFAC or other Federal agencies from further efforts to collect civil penalties from Epsilon related to the conduct addressed in this Complaint;

iv)      Award Epsilon damages where possible for undue financial harm and loss of business as a result of the grossly excessive fine imposed upon Epsilon as this Court determines just and proper;

v)       Award Epsilon attorneys' fees and costs incurred in this action; and

vi)      Such other and further relief as this Court deems just and proper.


Dated:  December 31, 2014                         Respectfully submitted,



                                   _____/s/ Teresa Taylor_____
                                   Teresa Taylor (DC Bar No. 484655)
                                   Farhad Alavi, (DC Bar No. 500560)
                                   Akrivis Law Group, PLLC
                                   5335 Wisconsin Avenue, NW
                                   Suite 440
                                   Washington, D.C. 20015
                                   (202) 730-1271
                                   ttaylor@akrivislaw.com
                                   falavi@akrivislaw.com
                                   Counsel for Plaintiff

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on the 31st day of December, 2014, I electronically filed the foregoing with the Clerk of Court of the U.S. District Court for the District of Columbia and served copies of the summons, complaint and initial order to the following by means of registered mail, return receipt requested in compliance with Rule 4 of the Federal Rules of Civil Procedure:

THE UNITED STATES OF AMERICA
UNITED STATES ATTORNEY FOR THE DISTRICT OF COLUMBIA
Civil Process Clerk
555 4th Street, NW
Washington, DC 20001

and

THE HONORABLE ERIC HOLDER, JR.
ATTORNEY GENERAL OF THE UNITED STATES
950 Pennsylvania Avenue, N. W
Room 511
Washington, DC 20530


UNITED STATES DEPARTMENT OF THE TREASURY,
OFFICE OF FOREIGN ASSETS CONTROL,
U.S. Department of Treasury
Treasury Annex
1500 Pennsylvania Avenue, NW
Washington, DC 20220

and

THE HONORABLE JACOB J. LEW, SECRETARY OF THE UNITED STATES
DEPARTMENT OF THE TREASURY, in his official capacity.
U.S. Department of Treasury
1500 Pennsylvania Avenue, NW
Washington, DC 20220

and

ADAM J. SZUBIN, DIRECTOR, OFFICE OF FOREIGN ASSETS CONTROL, UNITED
STATES DEPARTMENT OF THE TREASURY, in his official capacity.
U.S. Department of Treasury
Treasury Annex
1500 Pennsylvania Avenue, NW
Washington, DC 20220

_____/s/ Teresa Taylor_____
Teresa Taylor, Esq.
Akrivis Law Group, PLLC
5335 Wisconsin Avenue, NW
Suite 440
Washington, D.C. 20015
(202) 730-1271
ttaylor@akrivislaw.com

Counsel for Plaintiff

## EXHIBITS

## Table of Contents

**Exhibit A:** Distribution Agreement with Asra

**Exhibit B:** Administrative Subpoena dated August 18, 2011

**Exhibit C:** Administrative Subpoena dated December 14, 2011

**Exhibit D:** Cautionary Letter dated January 26, 2012

**Exhibit E:** Administrative Subpoena dated May 23, 2012

**Exhibit F:** Prepenalty Notice dated May 9, 2014

**Exhibit G:** Response to Prepenalty Notice dated June 6, 2014

**Exhibit H:** Penalty Notice dated July 21, 2014

**Exhibit A:**
**Distribution Agreement with Asra**

# EPSILON ELECTRONICS INC.
### Power Acoustik, Soundstream and Spl
## Exclusive Distributor Agreement

This Agreement is made this **February 1, 2012** between **Epsilon Electronics Inc.** 1550 S. Maple Ave, Montebello, CA 90640 USA, and hereinafter designated as "**Epsilon Electronics Inc.**", a California Corporation and

**Asra International Corporation L.L.C**
(DISTRIBUTOR name)

(Hereinafter referred to as DISTRIBUTOR) having its principal place of business at
**Deira, Opposite Hyatt Regency Hotel, Al Mussalla Road 261508 United Arab Emirates**

**Epsilon Electronics Inc.** and INTERNATIONAL DISTRIBUTOR agree as follows:

1.    Appointment of DISTRIBUTOR
**Epsilon Electronics Inc.** appoints DISTRIBUTOR and DISTRIBUTOR agrees to serve as DISTRIBUTOR, upon the terms and conditions set forth in this Agreement at the location(s) indicated herein.

DISTRIBUTOR agrees to maintain, at all times, during the term of this Agreement, a distribution facility for the sale of **Power Acoustik, Soundstream and Spl** brand products to authorized **Power Acoustik, Soundstream and Spl** dealers at each DISTRIBUTOR location, and DISTRIBUTOR agrees to promote and sell **Power Acoustik, Soundstream and Spl** brand products within the Territory  as defined herein.

Territory: **United Arab Emirates (UAE)**
And authorized to sell but not exclusive on the neighboring countries:
QATAR, KUWAIT, SAUDI ARABIA, JORDAN, BAHRAIN, JORDAN. KYRGYZSTAN. LEBANON. TAJIKISTAN. TURKMENISTAN. UZBEKISTAN. BENIN. BOTSWANA. BURKINA FASO. CAMEROON. CAPE VERDE. CENTRAL AFRICAN REP. EQUATORIAL GUINEA. ERITREA. GABON. GAMBIA. GUINEA BISSAU. GUINEA. MALAWI. MAURITANIA. MAURITIUS. MOROCCO. MOZAMBIQUE. SEYCHELLES. SIERRA LEONE. SWAZILAND. TANZANIA. TOGO. UGANDA. ZAMBIA. DJIBOUTI. KENYA. LESOTHO. LIBERIA. REUNION. RWANDA. SENEGAL. ZANZIBAR. ZIMBABWE
We authorize you to sell only to countries which USA can legally distribute and not conflicting with other exclusive agents that EPSILON ELECTRONICS INC. has assigned.

2.    Export Sales
DISTRIBUTOR shall not sell or otherwise transfer, directly or indirectly, **Epsilon Electronics Inc.** brand products to any person or entity located outside of the appointed country/countries, for resale without prior written consent of **Epsilon Electronics Inc.**

3.    Terms of Sale
**Epsilon Electronics Inc.** agrees to sell and DISTRIBUTOR agrees to purchase and pay for such quantities of Soundstream, Power Acoustik and Spl brand products as DISTRIBUTOR may reasonably request, equaling minimum of purchase requirements per **calendar** year as defined in article four (4) herein, for as long as the Agreement is in effect, at the prices then currently in effect.  All sales are subject to the other terms and conditions of sale established by **Epsilon Electronics Inc.** and in effect at the time of shipment.  The DISTRIBUTOR shall pay for all products in accordance with the invoice terms.  IT IS RECOGNIZED, ACKNOWLEDGED AND AGREED BY DISTRIBUTOR THAT, NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, UNDER NO CIRCUMSTANCES IS DISTRIBUTOR AUTHORIZED TO MANUFACTURE OR HAVE MANUFACTURED FOR DISTRIBUTOR, PURCHASE, DISTRIBUTE, SELL, IMPORT AND/OR EXPORT ANYWHERE IN THE WORLD, INCLUDING THE TERRITORY, Epsilon Electronics Inc. BRAND PRODUCTS THAT ARE NOT MANUFACTURED BY <u>AND</u> PURCHASED DIRECTLY FROM Epsilon Electronics Inc.

EPSILON ELECTRONICS, INC.
1550 S. MAPLE AVENUE
MONTEBELLO, CA
U.S.A. 90640

4.     Minimum Purchase Requirements
DISTRIBUTOR agrees to purchase a **minimum of $1,000,000.00 USD in SOUNDSTREAM, POWERACOUSTIK AND SPL brand** products in 1 calendar year in which this agreement is in effect. Once the minimum amount is achieved, the contract will automatically be renewed for the following year.

5.     Obligation to Promote Product Sales
The DISTRIBUTOR shall use its best efforts to stimulate interest in and to sell **Epsilon Electronics Inc.** brand products to its customers.  In particular, and without limiting the generality of the foregoing, the DISTRIBUTOR shall: (a) acquire and maintain adequate facilities, display and demonstration areas to explain and demonstrate the features of **Epsilon Electronics Inc.** brand products to its customers.  (b) Maintain a representative inventory of models and styles of each of **Epsilon Electronics Inc.** brand products in quantities sufficient to meet reasonably anticipated sales during a period of not less than one month and (c) at no time engage in any illegal, deceptive, unfair, or unethical trade practices such as "bait and switch" advertising or any other practices which may adversely affect the image and reputation of **Epsilon Electronics Inc.** or its products and shall make no false, misleading, or disparaging representations regarding **Epsilon Electronics Inc.** or any **Epsilon Electronics Inc.** brand products.

6.     Advertising
Unless otherwise authorized by **Epsilon Electronics Inc.** in advance, DISTRIBUTOR shall use **Epsilon Electronics Inc.** name, trademarks (including but not limited to **POWER ACOUSTIK , SOUNDSTREAM and SPL**), and trade names (said name, trademarks and trade names collectively referred to as the "**Epsilon Electronics Inc.** Brands"), and copyrighted materials (the "**Epsilon Electronics Inc.** Proprietary Materials") only for the purposes of advertising and promoting within the Territory, sales of **Epsilon Electronics Inc.** brand products, purchased from **Epsilon Electronics Inc.**  Distributor shall not use any of the **Epsilon Electronics Inc.** Brands and/or **Epsilon Electronics Inc.** Proprietary Materials: (a) in any advertising or other communication which is damaging to **Epsilon Electronics Inc.**; (b) in any unlawful manner; (c) in any way which tends directly or indirectly to lessen the value and goodwill of the **Epsilon Electronics Inc.** brand or products; and/or (d) in connection with the sale of any product or group of products not manufactured by and purchased from **Epsilon Electronics Inc.**, except that if components made by and purchased from **Epsilon Electronics Inc.** are in such group, Distributor may advertise such products provided such advertising specifically states such components are **Epsilon Electronics Inc.** products.  Distributor expressly recognizes, acknowledges and agrees that nothing herein shall transfer to DISTRIBUTOR any license, interest or ownership in any of the **Epsilon Electronics Inc.** Brands and/or **Epsilon Electronics Inc.** Proprietary Materials, and/or any name, trademark, trade name, or copyright, or in any patent application, patent right of **Epsilon Electronics Inc.** in any of the **Power Acoustik, Soundstream and Spl** products distributed by Distributor hereunder this Agreement, or license in or to any of said products, and provided further DISTRIBUTOR's rights to use such materials and names shall terminate upon the termination of this Agreement.

DISTRIBUTOR shall not advertise or engage in promotional activities concerning **Epsilon Electronics Inc.** brand products unless DISTRIBUTOR has in stock a sufficient supply of the advertised product or products to meet anticipated demand.  Failure to comply with this requirement shall be grounds for termination of this Agreement by **Epsilon Electronics Inc.**

7.     **Epsilon Electronics Inc.'s** Ownership of All Rights in the Epsilon Electronics Inc. Brands and Epsilon Electronics Inc. Proprietary Materials.
Notwithstanding anything to the contrary in this Agreement, **Epsilon Electronics Inc.**, and **Epsilon Electronics Inc.** successors and/or assigns, shall be and remain the owner of all right, title and interest in and to each and every one of the **Epsilon Electronics Inc.** Brands, and all **Epsilon Electronics Inc.** Proprietary Material, throughout the world, including, but not limited to the Territory, and any and all rights in each and every one of the **Epsilon Electronics Inc.** Brands and/or **Epsilon Electronics Inc.** Proprietary Material occasioned by the use of any of those Brands and/or Materials in connection with products manufactured by and/or purchased from **Epsilon Electronic Inc.**, and/or sold and/or distributed by Distributor pursuant to this Agreement, shall inure solely to **Epsilon Electronics Inc.**, its successors and/or assigns.  Distributor expressly and unconditionally waives, without reservation of any kind, any claim to any right, title or interest, anywhere in the world, including, but not limited to within the Territory, to any of the **Epsilon Electronics Inc.** Brands and/or any of the **Epsilon Electronics Inc.** Proprietary Materials, as used in connection with the products manufactured by and/or purchased from **Epsilon Electronics Inc.**, and/or any products marketed, distributed and/or sold by Distributor.  The terms of this Article 7 of this Agreement shall survive the termination of this Agreement.

2/4

EPSILON ELECTRONICS, INC.
1550 S. MAPLE AVENUE
MONTEBELLO, CA
U.S.A. 90640

8.    Representations and Warranties of Distributor.

Distributor represents, warrants and agrees that: (a) Except for **Epsilon Electronics Inc.** products manufactured by, and purchased by Distributor directly from, **Epsilon Electronics Inc.** pursuant to this Agreement, Distributor will not, at any time, apply and/or cause to be applied, any of the **Epsilon Electronics Inc.** Brands to, or market, sell, ship, distribute, or transfer to any person, within or outside the Territory, any product bearing any of the **Epsilon Electronics Inc.** Brands, or any colorable imitation of any of the **Epsilon Electronics Inc.** Brands; (b) Distributor will not, directly or indirectly, contest, before any governmental agency or unit, in any court or proceeding, including, but not limited to, any arbitration, mediation, domain name and/or key word registration or proceeding, anywhere throughout the world, including, but not limited in the Territory: (i) any trademark, trade name, domain name, keyword and/or other registration of **Epsilon Electronics Inc.**, its successors and/or assigns, for any of the **Epsilon Electronics Inc.** Brands ("**Epsilon Electronics Inc.** Registrations"); (ii) the sole and exclusive ownership of all right, title, and interest in **Epsilon Electronics Inc.** and/or **Epsilon Electronics Inc.** successors and assigns, in and to each of the **Epsilon Electronics Inc.** Brands, **Epsilon Electronics Inc.** Registrations, and all of the **Epsilon Electronics Inc.** Proprietary Material; and/or (iii) the validity of any of the **Epsilon Electronics Inc.** Brands and/or **Epsilon Electronics Inc.'s** Registrations; (c) Distributor will not, directly or indirectly, seek to register as a trademark, trade name, domain name, key word, corporate name, or otherwise, any of the **Epsilon Electronics Inc.** Brands, with any governmental agency or unit, or with any key word and/or domain name registrar or registering authority, anywhere throughout the world, including but not limited to within the Territory; and (d) when **Epsilon Electronics Inc.** ceases selling product to Distributor, and/or upon termination of this Agreement, whichever event shall earlier occur, Distributor immediately shall destroy all of the **Epsilon Electronics Inc.** Proprietary Materials, and/or any other materials bearing any of the **Epsilon Electronics Inc.** Brands.  A breach by Distributor of any of its representations and warranties set forth in this Article 8 shall be grounds for termination of this Agreement.  The terms of this Article 8 of this Agreement shall survive the termination of this Agreement.

9.    Terms of Agreement and Termination.

This agreement shall begin on the date written above and shall continue until **December 31, 2012**    unless terminated.  Either **Epsilon Electronics Inc.** or DISTRIBUTOR may terminate this Agreement as follows:  Where the termination is without cause, sixty (60) days' written notice, pursuant to the terms of this Agreement must be given to the other party. Where the termination is for cause (breach of this agreement in whole or part), such sixty (60) days advance written notice may, but need not, be given. Upon termination, DISTRIBUTOR agrees to cease representing itself as an **Epsilon Electronics Inc.** DISTRIBUTOR and all open invoices are due and payable at the sole option of **Epsilon Electronics Inc.**

10.    Warranties

DISTRIBUTOR shall make its own warranties or guarantees according to the conditions and situations of each country with respect to **Epsilon Electronics Inc.** brand products.  For the repairs and services, **Epsilon Electronics Inc.** will provide spare parts and schematics of each product that are applicable.  For requesting spare parts list, DISTRIBUTOR must send detailed description, parts #, location #, model # and serial # of the products. Warranty will be issued by **Epsilon Electronics Inc.**

11.    Product Changes

**Epsilon Electronics Inc.** may at any time add, change, or cease making product available without notice to DISTRIBUTOR and DISTRIBUTOR shall have no claims or damages against **Epsilon Electronics Inc.** for failure to furnish product of the model, design, or type previously sold.

12.    Product Liability

DISTRIBUTOR agrees not to modify any **Epsilon Electronics Inc.** brand products for use other than that specified by the relevant owner's manual and installation guide.  **Epsilon Electronics Inc.** shall not be responsible for any damages or liabilities and DISTRIBUTOR indemnifies **Epsilon Electronics Inc.** against any such claims, civil or criminal in relation to any such **Epsilon Electronics Inc.** brand product modification caused by DISTRIBUTOR which may cause, but not limited to, serious bodily injury, death and/or property damage.

13.    No Agency

Nothing contained in this Agreement shall be deemed to constitute the DISTRIBUTOR an agent, representative, or employee of **Epsilon Electronics Inc.** for any purpose.  DISTRIBUTOR is not granted, and shall not represent in any way, that it possesses any right or authority to assume any obligation or make any agreement or commitment, express or implied, on behalf of or in the name of **Epsilon Electronics Inc.** except as specifically provided herein.

EPSILON ELECTRONICS, INC.
1550 S. MAPLE AVENUE
MONTEBELLO, CA
U.S.A. 90640

14.    Non-Assignment
DISTRIBUTOR shall have no right to assign, transfer or sell its rights under this Agreement without the prior written consent of **Epsilon Electronics Inc.**

15.    Indemnification
DISTRIBUTOR agrees to indemnify and hold **Epsilon Electronics Inc.** harmless from and against any and all claims, damages, and liabilities whatsoever, asserted by any person or entity resulting directly or indirectly from any breach by DISTRIBUTOR of this Agreement. And such indemnification shall include the payment of all costs and reasonable attorney's fees expended by **Epsilon Electronics Inc.** in defending such claims.  DISTRIBUTOR shall be required to reimburse **Epsilon Electronics Inc.** for costs and reasonable attorney's fees in the event that **Epsilon Electronics Inc.** institutes litigation against DISTRIBUTOR because of any breach by DISTRIBUTOR of this Agreement and **Epsilon Electronics Inc.** prevails therein.

16.    Governing Law
This Agreement shall be governed and construed in accordance with the laws of the State of California.  In the event that any of the provisions of this Agreement shall be held by a court of competent jurisdiction to be unenforceable, the remaining provisions of the Agreement shall remain in full force and effect.

The parties agree that any disputes or questions arising hereunder, including the construction or application of this Agreement, shall be settled by arbitration in accordance with the rules of the American Arbitration Association then in force and that the arbitration hearings shall be held in the county of Los Angeles, CA.  If the parties cannot agree upon an arbitrator within ten (10) working days after demand by either of the parties, either or both parties may request the American Arbitration Association to name a panel of five (5) arbitrators. **Epsilon Electronics Inc.** shall strike the names of two (2) on this list, the DISTRIBUTOR shall then strike two (2) names, and the remaining name shall be the arbitrator.  The decision of the arbitrator shall be final and binding upon the parties both as to law and to fact, and shall not be able to appeal to any court in any jurisdiction.  The expenses of the arbitrator shall be paid for by the party-bringing claim.  Notwithstanding the foregoing, prior to, in lieu of, and/or in addition to arbitration as set forth in this Article 16, **Epsilon Electronics Inc.** at its sole option and discretion, may take any and all action in the courts and/or before any other agencies, tribunals and/or other governmental authorities of any country, including with the Territory, with respect to any breach by Distributor of any of its representations and warranties under Article 8, above of this Agreement.

17.    Entire Agreement
This Agreement constitutes the entire agreement and understanding between the parties and supersedes all prior discussions, negotiations, and agreements between the parties, whether written or oral, with respect to the subject matter hereof.  This Agreement may not be altered, amended or modified except in a written agreement executed by both parties.


Epsilon Electronics Inc.:

BY _____     Date_____
**Jack Rochel**
President


DISTRIBUTOR:

Name _ASRA International Corporation L.L.c_
Sole Proprietor, Partnership, Corporation
(Cross out the two inapplicable options). If corporation, affix seal below.

By_Shahriar Hashem_____     Date_2-07-2012_
Please print name

By_____     Title_____
Authorized Signature

4/4

EPSILON ELECTRONICS, INC.
1550 S. MAPLE AVENUE
MONTEBELLO, CA
U.S.A. 90640

**<u>Exhibit B</u>:**
**Administrative Subpoena dated August 18, 2011**



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

## ADMINISTRATIVE SUBPOENA

ENF 22946

AUG 1 8 2011

Jack Rochel
President
Power Acoustik Electronics
1550 S. Maple Ave.
Montebello, CA  90640

Dear Mr. Rochel:

It has come to the attention of the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") that on or about June 9, 2008, Power Acoustik Electronics sent a package via DHL Express to Tehran, Iran (the "shipment").  The air waybill number for the shipment was 7462334460.

Pursuant to the Iranian Transactions Regulations, 31 C.F.R. part 560, and section 602 of the Reporting, Procedures and Penalties Regulations, 31 C.F.R. § 501.602, Power Acoustik Electronics is directed to provide OFAC the following detailed information regarding the shipment:

1. A detailed description of the shipment, including contents, purpose, and the names, titles, and business units of all individuals who performed any work for Power Acoustik Electronics relating to this transaction.  If any such individual was located outside of the United States while performing any work for Power Acoustik Electronics relating to this transaction, state whether that individual is a United States citizen or permanent resident alien.

2. A copy of all documents related to the above-referenced transaction, including but not limited to invoices, air waybills, shipping documents, financial and payment documents and correspondence (including but not limited to electronic mail and facsimile transmissions).

3. The license number authorizing this shipment, if any.

4. The names, addresses, and any other identifying information available on all of the parties involved in the shipment including the recipient.

5. A description of the relationships between or among those parties involved in the shipment.

6. A copy of Power Acoustik Electronics' internal procedures, if any, on compliance with the regulations administered by OFAC, or a description of the same, as well as the name(s), title(s), and business unit(s) of the person(s) responsible for implementation of any compliance program(s).  Provide a copy of all compliance manuals and training materials.  If Power Acoustik Electronics has no OFAC compliance program, please state so.

7. A detailed description identifying all other instances, during the five (5) years preceding the date of this Administrative Subpoena, in which Power Acoustik Electronics, its U.S. affiliates, branches, offices, agents, representatives, or distributors, directly or indirectly exported goods, services, or technology to Iran.  Provide the names, titles, and business units of all individuals who performed any work for Power Acoustik Electronics relating to these transactions.  If any such individual was located outside of the United States while performing any work for Power Acoustik Electronics relating to these transactions, state whether that individual is a United States citizen or permanent resident alien.  If there are no such exports, state so.

8. For all transactions identified in response to the questions above, include the names and addresses of all parties involved in the transactions and a description of the relationship between or among the parties.  Describe how the transactions were authorized within Power Acoustik Electronics and provide the names, titles, and business units of all individuals who authorized them.  If the transactions were not authorized, please explain.

You should be aware that failure to respond to this Administrative Subpoena may result in the imposition of civil penalties by OFAC and that, under 18 U.S.C. § 1001, knowingly and willfully falsifying or concealing a material fact in your response to this Administrative Subpoena may result in criminal fines, imprisonment, or both.

Please provide the information set forth above in writing and mail it, along with a completed Certificate of Compliance (enclosed), no later than 30 calendar days from the date of this Administrative Subpoena.  Address your response as follows:

> U.S. Department of the Treasury
> Office of Foreign Assets Control
> Attn:  John Hinton
> Office of Enforcement
> 1500 Pennsylvania Avenue, NW
> Washington, DC 20220

The enclosed yellow half-sheet must be stapled to the front of your response and your response must reference the "ENF" number printed above.

2

All aspects of this investigation are being handled by Enforcement Investigations Officer John Hinton.  If you have any questions, please contact Mr. Hinton at (202) 622-1664 or john.hinton@treasury.gov.

Issued on behalf of the Director of OFAC:

Amber Stokes
Section Chief
Enforcement Division I
Office of Foreign Assets Control

Enclosures:     Yellow half-sheet
                Certificate of Compliance

3

**<u>Exhibit C</u>:**
**Administrative Subpoena dated December 14, 2011**



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

## ADMINISTRATIVE SUBPOENA

ENF 37795

DEC 1 4 2011

Christopher Von Holt
FIU Investigations Unit Manager
Union Bank NA
400 California Street
San Francisco, CA 94194

Dear Mr. Von Holt

It has come to the attention of the U.S. Department of the Treasury's Office of Foreign Assets
Control ("OFAC") that between September 3, 2010, and October 18, 2011, accounts associated
with Epsilon Electronics Inc., d/b/a Power Acoustik, received five funds transfers totaling
$1,190,717.21 from the Commercial Bank of Dubai P.S.C. which appear to be on behalf of Asra
International Corporation, LLC.  It appears that these payments may have been for products
destined for Iran.

Pursuant to Iranian Transactions Regulations (the "Regulations"), 31 C.F.R. part 560,, and
section 602 of the Reporting, Procedures and Penalties Regulations ("RPPR"), 31 C.F.R.
§ 501.602, you are directed to provide OFAC with the following information:

1. The addresses of record and signature cards for any account owned by Epsilon
   Electronics Inc., Power Acoustik Electronics, Sound Stream, Precision Power, Kole
   Audio, Jack Rochel, or Sohail Rochel.
2. Account statements for any accounts owned by Epsilon Electronics Inc., Power Acoustik
   Electronics, Sound Stream, Precision Power, Kole Audio, SPL, Jack Rochel, or Sohail
   Rochel covering the five (5) years preceding the date of this Administrative Subpoena or
   since the date of account opening, if less than five years ago.
3. Any letters of credit, documentary credits, or related documents between Asra
   International Corporation LLC and Epsilon Electronics Inc., Power Acoustik Elecronics,
   Sound Stream, Precision Power, Kole Audio, Jack Rochel, or Sohail Rochel.
4. Payment instructions and any other available documents related to the following
   transactions:
   a. Wire transfer for $11,143.01 from Asra International Corporation LLC to Epsilon
      Electronics Inc., d/b/a Power Acoustik Electronics, on or about September 24,
      2010.

b. Wire transfer for $82,294.20 from Asra International Corporation LLC to Epsilon Electronics Inc., d/b/a Power Acoustik Electronics, on or about November 4, 2010.

c. Wire transfer for $702 from Asra International Corporation LLC to Epsilon Electronics Inc., d/b/a Power Acoustik Electronics, on or about March 11, 2011.

d. Letter of credit deposited for $221,429 from Asra International Corporation LLC to Epsilon Electronics Inc., d/b/a Power Acoustik Electronics, on or about July 9, 2011.

e. Wire transfer for $875,149 from the Commercial Bank of Dubai P.S.C. that appears to be on behalf of Asra International Corporation LLC to Epsilon Electronics Inc., d/b/a Power Acoustik Electronics, on or about August 30, 2011.

You should be aware that failure to respond to this Administrative Subpoena may result in the imposition of civil penalties by OFAC. Further, under 18 U.S.C. § 1001, knowingly and willfully falsifying or concealing a material fact in your response to this Administrative Subpoena may result in criminal fines, imprisonment, or both.

OFAC's request for the information sought above is made pursuant to § 203(a)(2) of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1702(a)(2). Broadly stated, this section authorizes the President (whose authority has been delegated to the Secretary of the Treasury) to require that complete information on transactions or acts subject to regulation pursuant to the President's exercise of emergency powers under IEEPA be maintained and provided under oath. OFAC has been delegated authority to request information with respect to any transaction subject to regulation pursuant to section 203(a)(2) of IEEPA and the Regulations. This Administrative Subpoena, therefore, is covered by Section 1113(d) of the Right to Financial Privacy Act ("RFPA"), 12 U.S.C. §§ 3401-22, which provides that nothing in that Act authorizes the withholding of "financial records or information required to be reported in accordance with any Federal statute or rule promulgated thereunder." RFPA, § 1113(d), 12 U.S.C. § 3413(d).

Please provide this information in writing, either in hardcopy or electronic format, and mail it no later than 30 calendar days from the date of this Administrative Subpoena. Address your response as follows:

U.S. Department of the Treasury
Office of Foreign Assets Control
Attn: John Hinton
Office of Enforcement
1500 Pennsylvania Ave., NW
Washington, DC 20220

The enclosed yellow half-sheet must be stapled to the front of your response and your response must reference the "ENF" number printed above.

2

All aspects of this investigation are being handled by Enforcement Officer John Hinton.  If you have any questions, please contact Mr. Hinton at (202) 622-1664 or john.hinton@treasury.gov.

Issued on behalf of the Director of OFAC:

Amber Stokes
Enforcement Section Chief
Office of Foreign Assets Control

Enclosures:    Yellow half-sheet

3

**Exhibit D:**
**Cautionary Letter dated January 26, 2012**



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

## CAUTIONARY LETTER

ENF 22946

JAN 2 6 2012

Jack Rochel
President
Power Acoustik Electronics Inc.
1550 S. Maple Ave.
Montebello, CA 90640

Dear Mr. Rochel:

Thank you for your letter, dated September 7, 2011, in response to an Administrative Subpoena dated August 18, 2011.

This letter serves as notice that the Department of the Treasury's Office of Foreign Assets Control ("OFAC") has completed its review of Power Acoustik Electronics Inc.'s ("Power Acoustik") shipment of spare parts for a monitor to Iran on June 9, 2008.   The Iranian Transactions Regulations, 31 C.F.R. part 560 (the "Regulations"), prohibit virtually all direct or indirect commercial financial or trade transactions with Iran by U.S. persons or within the United States, unless authorized by OFAC or exempted by statute.  Accordingly, Power Acoustik's shipment to Iran appears to have violated the Regulations.

OFAC has chosen to close this matter with this Cautionary Letter instead of pursuing a civil penalty.  This Cautionary Letter represents a final enforcement response to the apparent violations, but does not constitute a final agency determination as to whether a violation has occurred.  Nothing in this letter precludes OFAC from taking further action in the future should additional information warrant renewed attention.  Under applicable law, each violation of the Regulations is subject to a civil penalty of up to the greater of $250,000 or twice the value of each underlying transaction.  Please note that Power Acoustik's compliance history with regard to economic sanctions administered by OFAC, including any patterns of noncompliance, will be considered if further matters come to OFAC's attention.  Future transactions in violation of any economic sanctions program administered by OFAC may result in the imposition of civil penalties.

OFAC considers compliance with its Regulations by U.S. persons to be a critical part of the effectiveness of U.S. sanctions.  We trust that Power Acoustik will act in accordance with the Regulations in the future.

Should you have any questions, please contact John Hinton, Enforcement Officer, at (202) 622-2430 or john.hinton@treasury.gov, or visit OFAC's Web site at www.treasury.gov/ofac.

Sincerely,

Amber Stokes
Enforcement Section Chief
Office of Foreign Assets Control

**<u>Exhibit E</u>:**
**Administrative Subpoena dated May 23, 2012**



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

## ADMINISTRATIVE SUBPOENA

ENF 37795

MAY 2 3 2012

Jack Rochel
President
Epsilon Electronics Inc. d/b/a Power Acoustik Electronics
1550 S. Maple Ave.
Montebello, California 90640

Dear Mr. Rochel:

Pursuant to Iranian Transactions Regulations (the "Regulations"), 31 C.F.R. part 560, and section 602 of the Reporting, Procedures and Penalties Regulations, 31 C.F.R. § 501.602, Epsilon Electronics Inc. ("Epsilon"), d/b/a Power Acoustik Electronics, is directed to provide the Office of Foreign Assets Control ("OFAC") at the U.S. Department of the Treasury with the following detailed information:

1.  A detailed description of all transactions with Asra International Corporation LLC and Asra Electronics Co., including the names, titles, and business units of all individuals who performed any work for Epsilon relating to these transactions. This includes, but is not limited to, any sales person or other employee who communicated with Asra International Corporation LLC or Asra Electronics Co. If any such individual was located outside of the United States while performing any work for Epsilon relating to these transactions, state whether that individual is a United States citizen or permanent resident alien.

2.  A copy of all documents related to the above-referenced transactions, including but not limited to distribution agreements, contracts, invoices, air waybills, shipping documents, financing and payment documents, and correspondence (including but not limited to electronic mail and facsimile transmissions).

3.  A detailed description identifying all other instances, during the five (5) years preceding the date of this Administrative Subpoena, in which (a) Epsilon, (b) its U.S. affiliates ("Affiliated Entities"), or (c) branches, offices, agents, representatives, or distributors of Epsilon or any of its Affiliated Entities directly or indirectly exported goods, services, or technology to Iran. Provide the names, titles, and business units of all individuals who performed any work for Epsilon relating to these transactions. If any such individual was located outside of the United States while performing any work for Epsilon relating to these transactions, state whether that individual is a United States citizen or permanent resident alien. If there are no such exports, state so.

4. A detailed description identifying all instances, during the five (5) years preceding the date of this Administrative Subpoena, in which Epsilon directly or indirectly facilitated transactions engaged in by any other individual or entity involving Iran. Provide the names, titles, and business units of all individuals who performed any work for Epsilon relating to these transactions. If any such individual was located outside of the United States while performing any work for Epsilon relating to these transactions, state whether that individual is a United States citizen or permanent resident alien. If there are no such instances of facilitation, state so.

5. A copy of all sales, service, distribution, marketing, partnership, delivery or supply contracts or agreements, requests for proposal, and bid information or correspondence between (a) Epsilon, (b) its U.S. affiliates ("Affiliated Entities"), or (c) branches, offices, agents, representatives, or distributors of Epsilon or any of its Affiliated Entities and any individual or entity located in Iran. If none, state so.

6. A detailed description identifying any funds transfers, letters of credit, loan agreements, or any other means of financing, directly or indirectly, involving (a) Epsilon, (b) its U.S. affiliates ("Affiliated Entities"), or (c) branches, offices, agents, representatives, or distributors of Epsilon or any of its Affiliated Entities and any individual or entity located in Iran during the five (5) years preceding the date of this Administrative Subpoena, as well as a copy of all documents relating to such financing. If none, state so.

7. The names and addresses of any third parties who may have acted as an intermediary between Epsilon and any individual or entity located in Iran for any transactions during the five (5) years preceding the date of this Administrative Subpoena. If none, state so.

8. For all transactions identified in response to the questions above, the names and addresses of all parties involved in the transactions and a description of the relationships between or among those parties. Describe how the transactions were authorized within Epsilon, and provide the names, titles, and business units of all individuals who authorized them. If the transactions were not authorized, please explain.

9. For all transactions identified in response to the questions above, a copy of all documents related to the transactions, including but not limited to invoices, air waybills, shipping documents, financing and payment information, and correspondence (including but not limited to electronic mail and facsimile transmissions). If none, state so.

10. A statement as to whether Epsilon is currently engaging, or likely to engage, in any conduct or transactions directly or indirectly involving Iran, including but not limited to the types of transactions referred to in the questions set forth above. If Epsilon engaged in such conduct or transactions in the past but has ceased, explain when and why such conduct or transactions ceased.

11. A copy of Epsilon's internal procedures, if any, on compliance with the regulations administered by OFAC, or a description of the same, as well as the names, titles, and business units of the persons responsible for implementation of any compliance

programs.  Provide a copy of all compliance manuals and training materials.  If Epsilon has no OFAC compliance program, state so.

Failure to respond to this Administrative Subpoena may result in the imposition of civil penalties by OFAC.  Further, under 18 U.S.C. § 1001, knowingly and willfully falsifying or concealing a material fact in your response to this Administrative Subpoena may result in criminal fines, imprisonment, or both.

Please provide the information set forth above in writing, either in hardcopy or electronic format, and mail it, along with a completed Certificate of Compliance (enclosed), no later than 30 calendar days from the date of this Administrative Subpoena.  Address your response as follows:

> U.S. Department of the Treasury
> Office of Foreign Assets Control
> Attn: John Hinton
> Office of Enforcement
> 1500 Pennsylvania Avenue, NW
> Washington, DC 20220

The enclosed yellow half-sheet must be stapled to the front of your response and your response must reference the "ENF" number printed above.

All aspects of this investigation are being handled by Enforcement Officer John Hinton.  If you have any questions, please contact Mr. Hinton at (202) 622-1664 or john.hinton@treasury.gov.

Issued on behalf of the Director of OFAC:

Amber Stokes
Enforcement Section Chief
Office of Foreign Assets Control

Enclosures:   Yellow half-sheet
              Certificate of Compliance

3

**<u>Exhibit F</u>:**
**Prepenalty Notice dated May 9, 2014**



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

**PREPENALTY NOTICE**                    MAY 09 2014

ENF 37795

Jack Rochel
President
Epsilon Electronics Inc.
1550 S. Maple Ave.
Montebello, CA 90640

Dear Mr. Rochel:

The Office of Foreign Assets Control ("OFAC") has reason to believe that Epsilon Electronics Inc. ("Epsilon" or "you"), also doing business as Power Acoustik Electronics, Sound Stream, Kole Audio, and Precision Audio, engaged in certain conduct, detailed below, prohibited by Executive orders and/or regulations promulgated pursuant to the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-06 ("IEEPA").

**Apparent Violations**
The apparent violations for which this Prepenalty Notice ("Notice") is being issued involve the exportation of goods to Asra International Corporation LLC ("Asra"), also doing business as Asra Electronic Trading Co., with knowledge or reason to know that such goods are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran, in apparent violation of the Iranian Transactions and Sanctions Regulations (the "ITSR"), 31 C.F.R. part 560.[1]  Specifically, the apparent violations are as follows:

> **From on or about August 26, 2008, to on or about May 22, 2012, Epsilon appears to have violated 31 C.F.R. § 560.204 when it issued 39 invoices for car audio and video equipment, valued at $3,407,491, which was shipped to Asra, a company with offices in Tehran, Iran, and Dubai, U.A.E., that reexports most, if not all, of its products to Iran.  Epsilon knew or had reason to know that such goods were intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran.**

As discussed further below, OFAC has considered all of the information in its possession related to the apparent violations, as well as the General Factors Affecting Administrative Action ("General Factors") set forth in OFAC's Economic Sanctions Enforcement Guidelines (the "Guidelines").  *See*

---

[1] On October 22, 2012, OFAC changed the heading of 31 C.F.R. part 560 from the Iranian Transactions Regulations to *the Iranian Transactions and Sanctions Regulations* ("ITSR"), amended the renamed ITSR, and reissued them in their entirety.  *See* 77 Fed. Reg. 64,664 (Oct. 22, 2012).  For the sake of clarity, all references herein to the ITSR shall mean the regulations in 31 C.F.R. part 560 in effect at the time of the activity, regardless of whether such activity occurred before or after the regulations were renamed.

1

31 C.F.R. part 501 app. A (available at www.treasury.gov/ofac).  A civil monetary penalty appears to be the appropriate enforcement response to the apparent violations.

**Maximum Potential Penalty**
Section 206(b) of IEEPA, 50 U.S.C. § 1705(b), as amended, provides, in part, for a civil penalty for each violation of IEEPA not to exceed the greater of $250,000 or an amount that is twice the amount of the transaction that is the basis of the violation with respect to which the penalty is imposed.  Pursuant to this provision, you could be subject to a monetary penalty totaling $12,989,299, representing the sum of the maximum potential penalties for each of the 41 apparent violations.

**Proposed Penalty**
*Base Penalty Calculation:*  As described more fully in the Guidelines, in determining a proposed civil monetary penalty, OFAC first calculates a base penalty amount based on whether the apparent violations were voluntarily self-disclosed to OFAC and whether the case is determined to be "egregious."

After a review of the facts available to it, and pursuant to the Guidelines, OFAC has determined that:

- Epsilon did not make a voluntary self-disclosure.
- The apparent violations set forth above that occurred between and August 26, 2008, and March 14, 2011, were non-egregious violations.
- The apparent violations set forth that above that occurred between February 20, 2012, and May 22, 2012, were egregious violations.  The determination of egregiousness is based on an analysis of the applicable General Factors, with substantial weight to General Factors A, B, C, and D, as described below, with particular emphasis on General Factors A and B.  OFAC issued a cautionary letter to Epsilon on January 26, 2012, which explained that direct and indirect exports to Iran are generally prohibited by the ITSR.

Accordingly, the base penalty for the apparent violations equals the sum of the applicable Guidelines schedule amount for each apparent non-egregious violation and the sum of the applicable statutory maximum amount for each apparent egregious violation, which in this case totals $4,073,000.

(*See* attached Transaction and Penalty Amount Exhibit.)

*Analysis of General Factors:*  Pursuant to the Guidelines, OFAC may adjust the base penalty amount to reflect applicable General Factors, each of which may be considered aggravating or mitigating and may therefore result in a higher or lower proposed penalty.

In analyzing the General Factors, OFAC focused on the following:

*Aggravating General Factors:*

2

- Epsilon demonstrated reckless disregard for U.S. sanctions requirements by exporting its products to Asra, a company it knew or had reason to know was distributing most, if not all, of its products in Iran;
- It appears that Epsilon attempted to hide or purposely obfuscate its sales to Iran when it changed a Web site to remove a photo gallery of Epsilon's products that was labeled "Iran;"
- The apparent violations constituted or resulted in a systematic pattern of conduct;
- Five of Epsilon's shipments to Asra occurred after Epsilon, under its alternative business name Power Acoustik, received a cautionary letter from OFAC for an attempt to send goods directly to Iran;
- Epsilon exported goods to Asra valued at $3,407,491;
- Epsilon had no compliance program at the time of the apparent violations; and
- Epsilon attempted to mislead OFAC by providing false information in its subpoena responses and other letters to OFAC.

*Mitigating General Factors:*
- Epsilon is eligible for up to 25% "first offense" mitigation, because Epsilon has not been the subject of a penalty notice or Finding of Violation from OFAC in the five years preceding the earliest date of the transactions constituting the apparent violations;
- Epsilon is a small business; and
- Epsilon provided some cooperation to OFAC, including entering into an agreement to toll the statute of limitations for one year.

OFAC has determined that these factors taken together support a zero percent net aggravation/mitigation from the base penalty amount.

*Proposed Civil Monetary Penalty:* Pursuant to 31 C.F.R. § 560.701, and in light of the analysis of the General Factors set forth above, OFAC intends to issue a civil monetary penalty against you in the amount of $4,073,000.

OFAC may adjust the proposed civil monetary penalty amount set forth above based on evidence presented in any response by you to this Notice, any additional facts otherwise made available to OFAC, and/or any modification resulting from further review and reconsideration by OFAC of the proposed civil monetary penalty in light of the General Factors.

**Subsequent Proceedings**

1. You have the right to provide a written response to OFAC within 30 days of the mailing of this Notice. Such written response to this Notice need not be in any particular form, but it should contain a response to the allegations herein, setting forth the reasons why the proposed penalty should not be imposed, or, if imposed, why the amount should be less than that proposed in this Notice. The written response should refer to the General Factors set forth in the Guidelines, and should provide any other information or evidence that you deem relevant to OFAC's consideration of this matter. The response should be addressed to: John Hinton, Office of Foreign Assets Control, U.S. Department of the Treasury, 1500 Pennsylvania Avenue, NW, Washington, DC 20220. A copy may be sent by facsimile to (202) 622-5445, but the original also must be sent to OFAC by mail or courier and must be postmarked or date-stamped. You should retain a receipt or other

3

evidence that shows the date you sent the response to OFAC. **Your written response must be postmarked no later than 30 days after the date of service[2] of this Notice.** After receiving and considering any written response from you, OFAC may issue a Penalty Notice in accordance with 31 C.F.R. § 560.704, finding a violation and assessing a civil monetary penalty.

2.  In the event that you elect not to respond within 30 days, OFAC will conclude that you have decided not to submit any new facts or explanations for OFAC's consideration.  In such instance, OFAC may issue a Penalty Notice in accordance with 31 C.F.R. § 560.704, finding a violation and assessing a civil monetary penalty.

3.  Should you seek to resolve this matter absent any final agency finding of violation, you may initiate settlement negotiations by telephoning the OFAC staff member named below under "Contact Person," or by submitting a written offer of settlement to OFAC, at any time during the civil penalty process.  If the negotiations result in settlement within the time period set forth in this Notice, you will not be required to make a written response to this Notice, which will be withdrawn without a formal determination of violation.  In the event no settlement is reached, the period specified for written response to this Notice remains in effect unless additional time is granted by OFAC.

### Collection
31 C.F.R. § 560.705 provides that this matter may be referred for administrative collection measures by the Department of the Treasury or to the United States Department of Justice for appropriate action to recover the penalty in a civil suit if any penalty assessed is not paid within 30 days of the mailing of the written notice of the imposition of the penalty.

Please note that 31 U.S.C. § 7701 requires that a person assessed a penalty by a Federal agency furnish a taxpayer identification number/Social Security Number.  OFAC hereby discloses OFAC's intent to use such number for the purposes of collection and reporting on any delinquent penalty amount in the event of a failure to pay the penalty imposed.

### Contact Person
If you have any questions concerning this matter, please feel free to contact John Hinton at telephone number (202) 622-1664.  Please have the ENF number listed at the top of this Notice available when you call.

Sincerely,

Thomas Feddo
Acting Associate Director for Enforcement
Office of Foreign Assets Control

Encl

---

[2] The date of service of this Notice is the date stamped on the first page of this Notice, unless you submit to OFAC a copy of the envelope in which this Notice was sent showing a later postmark date, in which case the later date will be the date of service.

4

ENF 37795

### TRANSACTION AND PENALTY AMOUNT EXHIBIT

### NON-EGREGIOUS VIOLATIONS

| # | Date | Amount | Reference | Maximum Penalty | Base Penalty |
|---|------|--------|-----------|-----------------|--------------|
| 1 | 8/26/08 | 354,800.00 | Invoice 601615 | 709,600 | 250,000 |
| 2 | 8/29/08 | 67,800.00 | Invoice 232351 | 250,000 | 100,000 |
| 3 | 10/20/08 | 64,000.00 | Invoice 234571 | 250,000 | 100,000 |
| 4 | 10/20/08 | 201,400.00 | Invoice 602700 | 402,800 | 250,000 |
| 5 | 5/15/09 | 86,410.80 | Invoice 245930 | 250,000 | 100,000 |
| 6 | 5/19/09 | 13,469.40 | Invoice 246039 | 250,000 | 25,000 |
| 7 | 5/19/09 | 28,172.11 | Invoice 246036 | 250,000 | 50,000 |
| 8 | 5/19/09 | 49,478.70 | Invoice 607868 | 250,000 | 50,000 |
| 9 | 5/22/09 | 1,180.80 | Invoice 246415 | 250,000 | 10,000 |
| 10 | 9/17/09 | 109,375.25 | Invoice 253242 | 250,000 | 170,000 |
| 11 | 9/17/09 | 88,605.60 | Invoice 253247 | 250,000 | 100,000 |
| 12 | 9/17/09 | 37,529.60 | Invoice 253248 | 250,000 | 50,000 |
| 13 | 9/17/09 | 161,059.53 | Invoice 611427 | 322,119 | 170,000 |
| 14 | 9/24/09 | 1,407.60 | Invoice 253547 | 250,000 | 10,000 |
| 15 | 9/24/09 | 8,473.50 | Invoice 253548 | 250,000 | 10,000 |
| 16 | 9/30/09 | 336,100.00 | Invoice 611741 | 672,200 | 250,000 |
| 17 | 10/5/09 | 1,760.40 | Invoice 254137 | 250,000 | 10,000 |
| 18 | 3/12/10 | 1,102.90 | Invoice 616007 | 250,000 | 10,000 |
| 19 | 4/14/10 | 359.65 | Invoice 616906 | 250,000 | 1,000 |
| 20 | 4/14/10 | 49.96 | Invoice 264957 | 250,000 | 1,000 |
| 21 | 4/15/10 | 371.10 | Invoice 616984 | 250,000 | 1,000 |
| 22 | 4/27/10 | 228.70 | Invoice 617340 | 250,000 | 1,000 |
| 23 | 5/6/10 | 120.06 | Invoice 266607 | 250,000 | 1,000 |
| 24 | 5/6/10 | 151.00 | Invoice 617702 | 250,000 | 1,000 |
| 25 | 5/27/10 | 8,600.00 | Invoice 618613 | 250,000 | 10,000 |
| 26 | 6/23/10 | 152.25 | Invoice 619697 | 250,000 | 1,000 |
| 27 | 7/9/10 | 565,730.00 | Invoice 620385 | 1,131,460 | 250,000 |
| 28 | 8/2/10 | 34,400.00 | Invoice 621254 | 250,000 | 50,000 |
| 29 | 8/24/10 | 52,500.00 | Invoice 621771 | 250,000 | 100,000 |
| 30 | 11/22/10 | 227.20 | Invoice 624186 | 250,000 | 1,000 |
| 31 | 12/2/10 | 124,144.94 | Invoice 624426 | 250,000 | 170,000 |
| 32 | 12/2/10 | 97,140.84 | Invoice 279743 | 250,000 | 100,000 |
| 33 | 3/15/11 | 719,860.00 | Invoice 627106 | 1,439,720 | 250,000 |
| 34 | 3/15/11 | 155,700.00 | Invoice 284362 | 311,400 | 170,000 |
| **Totals:** | | **3,371,862** | | **11,739,299** | **2,823,000** |
| **Proposed Penalty:** | | | | | **2,823,000** |

1

ENF 37795

## TRANSACTION AND PENALTY AMOUNT EXHIBIT

### EGREGIOUS VIOLATIONS

| # | Date | Transaction | | Maximum Penalty | Base Penalty |
|---|------|-------------|-----------|-----------------|--------------|
| | | Amount | Reference | | |
| 1 | 2/20/12 | 5,335.40 | Invoice 636759 | 250,000 | 250,000 |
| 2 | 3/6/12 | 117.00 | Invoice 637319 | 250,000 | 250,000 |
| 3 | 3/23/12 | 120.40 | Invoice 637912 | 250,000 | 250,000 |
| 4 | 5/22/12 | 25,868.90 | Invoice 640352 | 250,000 | 250,000 |
| 5 | 5/22/12 | 4,187.00 | Invoice 305361 | 250,000 | 250,000 |
| Totals: | | 35,629 | | 1,250,000 | 1,250,000 |
| Proposed Penalty for Egregious Violations | | | | | 1,250,000 |

### TOTAL PENALTIES

| Violation Type | Maximum Penalty | Base Penalty |
|----------------|-----------------|--------------|
| Non-Egregious Violations | 11,739,299 | 2,823,000 |
| Egregious Violations | 1,250,000 | 1,250,000 |
| Totals: | 12,989,299 | 4,073,000 |
| Proposed Penalty | | 407,300 |

2

**Exhibit G:**
**Response to Prepenalty Notice dated June 6, 2014**

FILE COPY

LAW OFFICES

## HOCHMAN, SALKIN, RETTIG, TOSCHER & PEREZ, P.C.

EDWARD M. ROBBINS, JR.
DIRECT LINE
(310) 281-3247

DIRECT FAX
(310) 859-5129

E-MAIL
EDR@TAXLITIGATOR.COM

9150 WILSHIRE BOULEVARD
SUITE 300
BEVERLY HILLS, CALIFORNIA 90212-3414
WWW.TAXLITIGATOR.COM

TELEPHONE
(310) 281-3200

FACSIMILE
(310) 859-1430

June 6, 2014

*Via Fax (202-622-5445) and Federal Express*

John Hinton
Office of Foreign Assets Control
U.S. Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, DC 20220

Re:   Epsilon Electronics, Inc.

Dear Mr. Hinton:

This letter is in response to the Prepenalty Notice dated May 9, 2014, issued to Epsilon Electronics, Inc. ("Epsilon"), a copy of which is attached.

We have previously provided you submissions dated July 6, 2012 and January 12, 2012 that have set forth our position that Epsilon did not know or have reason to know that the goods it shipped to Asra International Corporation LLC ("Asra") in Dubai were being shipped to Iran, if that is the case. Epsilon has explained that it has authorized Asra to distribute its products in only Dubai and certain nearby regions, not including Iran, and each invoice at issue shows that the goods were shipped to Asra in Dubai.

The Rochel family members who own Epsilon resent Iran due to Iran's history of religious persecution of Jews, and do not want their products shipped to Iran. Jack Rochel and his family are religious and observant Jews, and strong supporters of Israel and AIPAC (The American Israel Public Affairs Committee), an organization that is trying to stop Iran from getting nuclear weapons. His children have always gone to Jewish schools and he supports many Jewish organizations that support Israel. They believe that the Iranian regime in its entirety has to be overthrown and they do not want to directly or indirectly support Iran or the Iranian market in any way.

The Prepenalty Notice that was issued to Epsilon does not provide any evidence to support that the goods were in fact shipped to Iran, nor any evidence that Epsilon knew or had reason to know that

John Hinton
June 6, 2014
Page 2

the goods were specifically intended for Iran, as is required by 31 C.F.R. section 560.204.  With respect to Epsilon's website, which at one time had a reference to Iran, Epsilon is not specifically aware of the circumstances giving rise to the flag and related photos appearing on its website, as the owners and managers of Epsilon do not handle the maintenance of their website. However, it is their understanding that their website may include flags for some countries in which they do not in fact sell their products, in an effort to promote their company by giving the appearance that they have a widespread global presence, in order to remain competitive with the major players in the electronics market.

Accordingly, no penalty should apply because there was no violation of the Iranian Transactions and Sanctions Regulations.

Very truly yours,

*Edward M. Robbins, Jr.*

EDWARD M. ROBBINS, JR.

EMR:les
Enclosure

3396854

**<u>Exhibit H</u>:**
**Penalty Notice dated July 21, 2014**



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

JUL 2 1 2014

## PENALTY NOTICE

ENF 37795

Jack Rochel
President
Epsilon Electronics Inc.
1550 S. Maple Ave.
Montebello, CA 90640

Dear Mr. Rochel:

On May 9, 2014, the Office of Foreign Assets Control ("OFAC") issued a Prepenalty Notice ("Notice") to Epsilon Electronics Inc. ("Epsilon" or "you"), also doing business as Power Acoustik Electronics, Sound Stream, Kole Audio, and Precision Audio, due to your exportation of goods to Asra International Corporation LLC ("Asra"), also doing business as Asra Electronic Trading Co., with knowledge or reason to know that such goods were intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran, in apparent violation of the Iranian Transactions and Sanctions Regulations (the "ITSR"), 31 C.F.R. part 560, promulgated pursuant to the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-06.

The Notice proposed a penalty in the amount of **$4,073,000** and advised you of the right to make a written presentation to OFAC setting forth the reasons why a penalty should not be imposed, or, if imposed, why the amount should be less than that proposed in the Notice.

You responded to OFAC by letter dated June 6, 2014.  In your response, you asserted that no violation of the ITSR occurred, and that: you did not know or have reason to know that the goods were being shipped to Iran; Epsilon did not authorize Asra to export goods to Iran; the invoices were addressed to Dubai, the U.A.E.; Epsilon is not "specifically aware" of the circumstances surrounding a photo gallery on your Web site that referenced Iran; and, Epsilon would not ship its products to Iran because of your religious beliefs.

After a thorough review of the facts and circumstances pertaining to this matter, including your response to the Notice, OFAC has determined that you have violated § 560.204 of the ITSR and that no reduction from the proposed penalty amount set forth in the Notice is warranted. Multiple facts tend to show that the goods exported to Asra were sent to Iran and that Epsilon knew or had reason to know that the goods were intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran.  Specifically, Asra's Web site indicates that it only distributes in Iran; Epsilon attempted to send one shipment of goods directly to Asra's address in Iran; and Epsilon posted pictures on its Web site of its products in Iran.  Asra also posted these photos on its Web site, and labeled them as being from Iran.

Accordingly, a civil penalty in the amount of **$4,073,000** is hereby imposed upon **Epsilon Electronics Inc.** pursuant to 31 C.F.R. §560.704.

ENF 37795                                                                Page 2 of 2
Epsilon Electronics Inc.

You must pay this penalty or arrange for installment payment of the penalty within 30 days of the mailing of this Penalty Notice to avoid the imposition of additional charges.  Payment by check payable to the "**U.S. Treasury**" in the amount of **$4,073,000 and referencing the above ENF number** can be sent to the U.S. Department of the Treasury, Accounting Services Branch, Attn: Melissa Mayle, Avery Street A3-G, Bureau of the Fiscal Service, PO Box 1328, Parkersburg, WV 26106.  Alternatively, you may pay through Electronic Funds Transfer (EFT).  Instructions for EFT payment are enclosed.  Pursuant to 31 U.S.C. § 7701, **you must include a Taxpayer Identification Number or Social Security Number on your payment;** that number will be used for the purpose of collecting and reporting on any delinquent penalty amount.  **Pursuant to 31 U.S.C. § 3717, failure to pay this penalty in a timely manner will result in the accrual of appropriate interest, the imposition of an applicable administrative charge, and, if the payment is more than 90 days past due, the imposition of further penalty charges.**

Please note that 31 C.F.R. § 560.706 provides that this matter may be referred either for administrative collection measures or to the U.S. Department of Justice for appropriate action to recover the penalty in a civil suit in Federal District Court if payment is not made within 30 days of the date of this Penalty Notice.

If you have any questions concerning this matter, you may contact John Hinton, Enforcement, Office of Foreign Assets Control, at (202) 622-1664.  Please have the ENF number listed at the top of this Notice available when you call.

Sincerely,

Adam J. Szubin
Director
Office of Foreign Assets Control

Enclosure