## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
EPSILON ELECTRONICS, INC.,              )
                                        )
        Plaintiff,                      )
                                        )
    v.                                  )        Civil Action No. 14-2220 (RBW)
                                        )
UNITED STATES DEPARTMENT OF THE         )
TREASURY, OFFICE OF FOREIGN ASSETS      )
CONTROL, et al.,                        )
                                        )
                                        )
        Defendants.                     )
_____)

## <u>MEMORANDUM OPINION</u>

The plaintiff, Epsilon Electronics, Inc., seeks judicial review of the decision of the Office

of Foreign Assets Control ("OFAC"), a division of the United States Department of the Treasury

("Treasury"), to impose a civil monetary penalty of $4,073,000 against the plaintiff, following

the plaintiff's alleged exportation of goods to Iran in contravention of United States economic

sanctions.  Complaint ("Compl.") ¶¶ 8, 22–27, 55.  Currently pending before the Court are the

parties' cross-motions for summary judgment.  Upon careful consideration of the parties'

submissions, the Court concludes that the defendants' motion for summary judgment must be

granted, and the plaintiff's cross-motion for summary judgment must be denied.[1]

---

[1] In addition to the Complaint, the Court considered the following submissions in rendering its decision: (1) the Defendants' Motion for Summary Judgment ("Defs.' Mot."); (2) the Defendants' Statement of Points and Authorities in Support of Motion for Summary Judgment ("Defs.' Mem."); (3) the plaintiff's Motion in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiff's Cross Motion for Summary Judgment ("Pl.'s Mot."); (4) the plaintiff's Memorandum in Support of Plaintiff's Motion in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiff's Cross Motion for Summary Judgment ("Pl.'s Mem."); (5) the Reply in Support of Defendants' Motion for Summary Judgment and Opposition to Plaintiff's Cross-Motion for Summary Judgment ("Defs.' Reply"); (6) the Reply in Support of Plaintiff's Cross-Motion for Summary Judgment and Opposition to Defendants' Motion for Summary Judgment ("Pl.'s Reply"); and (7) the Local Rule 7(n) Excerpts of Administrative Record provided by the defendants and the Appendix of Additional Exhibits from Administrative Record in Response to Minute Order Dated February 11, 2016, provided by the plaintiff (collectively, "AR").

## I.   BACKGROUND

### A.   The Iran Sanctions Program and OFAC's Regulatory Authority

The United States imposes economic sanctions against foreign nations pursuant to the

Trading With the Enemy Act, as amended by the International Emergency Economic Powers Act

("IEEPA"), 50 U.S.C. §§ 1701–07 (2012).   The IEEPA authorizes the President to declare a

national emergency "to deal with any unusual and extraordinary threat, which has its source in

whole or substantial part outside the United States, to the national security, foreign policy, or

economy of the United States."   50 U.S.C. § 1701(a).   Under this statute, the President may

> investigate, block during the pendency of an investigation, regulate, direct and
> compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding,
> use, transfer, withdrawal, transportation, importation or exportation of, or dealing
> in, or exercising any right, power, or privilege with respect to, or transactions
> involving, any property in which any foreign country or a national thereof has any
> interest by any person, or with respect to any property, subject to the jurisdiction of
> the United States . . . .

50 U.S.C. § 1702(a)(1)(B); see generally Regan v. Wald, 468 U.S. 222, 227–28 (1984)

(discussing the President's authority under the Trading With the Enemy Act and the IEEPA).

The first economic sanctions against Iran were imposed in 1979, see Exec. Order No.

12170, 44 Fed. Reg. 65,729 (Nov. 14, 1979), and the current scheme of sanctions against Iran is

embodied primarily in the Iranian Transactions and Sanctions Regulations ("Regulations"), 31

C.F.R. pt. 560 (2014).   Most relevant to this case, the Regulations prohibit

> the exportation, reexportation, sale, or supply, directly or indirectly from the United
> States, or by a United States person, wherever located, of any goods, technology,
> or services to Iran or the Government of Iran . . . including the exportation,
> reexportation, sale, or supply of any goods, technology, or services to a person in a
> third country undertaken with the knowledge or reason to know that:
>    (a) Such goods, technology, or services are intended specifically for supply,
>        transshipment, or reexportation, directly or indirectly, to Iran or the
>        Government of Iran; or
>    (b) Such goods, technology, or services are intended specifically for use in the
>        production of, for commingling with, or for incorporation into goods,

> technology, or services to be directly or indirectly supplied, transshipped, or reexported exclusively or predominantly to Iran or the Government of Iran.

31 C.F.R. § 560.204.  The Regulations also provide that "no United States person, wherever located, may engage in any transaction or dealing in or related to . . . [g]oods, technology, or services for exportation, reexportation, sale or supply, directly or indirectly, to Iran or the Government of Iran."  Id. § 560.206(a)(2).

The Regulations set forth the procedure OFAC utilizes to adjudicate cases involving alleged violations of the Regulations.  Id. §§ 560.703, .704; see also id. pt. 501, App. A, § V.A (describing OFAC's civil penalty process).  The IEEPA authorizes civil penalties for violations of the Regulations.  50 U.S.C. § 1705(b).  And when determining a penalty against a violator, OFAC considers the General Factors listed in its economic sanctions enforcement guidelines.  31 C.F.R. pt. 501, App. A, § III.  The amount of the penalty depends in part on whether OFAC determines that the violation is egregious or nonegregious.  See id. § V.B.

### B.  OFAC's Determinations Regarding the Plaintiff

OFAC learned that in 2008, an entity named Power Acoustik Electronics, Inc. ("Power Acoustik") sent a shipment to an address in Tehran, Iran, see AR-0001 (airway bill), which prompted OFAC to issue a subpoena to Power Acoustik, see AR-0724 (internal OFAC memorandum describing factual background).  In response to the subpoena, Power Acoustik informed OFAC that it had no knowledge of the shipment.  AR-0002–03.  OFAC closed that investigation with the issuance of a cautionary letter dated January 26, 2012, with OFAC informing Power Acoustik that the Regulations "prohibit virtually all direct or indirect commercial financial or trade transactions with Iran by U.S. persons or within the United States unless authorized by OFAC or exempted by statute," that the 2008 shipment to Iran "appears to

have violated the [Regulations]," and that OFAC could "tak[e] further action in the future should additional information warrant renewed attention."  AR-0006.  The cautionary letter also warned that "each violation of the [Regulations] is subject to a civil penalty of up to the greater of $250,000 or twice the value of each underlying transaction," and that "Power Acoustik's compliance history with regard to economic sanctions administered by OFAC, including any patterns of noncompliance, will be considered if further matters come to OFAC's attention."  Id.

Separately, OFAC also learned that between September 2010 and October 2011, the plaintiff, doing business as Power Acoustik, had received wire transfers totaling more than $1.1 million "from the Commercial Bank of Dubai, P.S.C., which appear[ed] to be on behalf of Asra International Corporation, LLC," and that these payments "may have been for products destined for Iran."  See AR-0072 (December 2011 administrative subpoena to Union Bank, N.A.).  OFAC subsequently issued a subpoena to the plaintiff seeking records relating to its transactions with Asra International Corporation, LLC ("Asra International").  AR-0316.  The plaintiff's response to the subpoena included documents regarding 41 sales of audio and video equipment to Asra International spanning the period August 2008 to May 2012, and totaling $3,407,491.  See AR-0312–13 (the plaintiff's response to subpoena listing shipments to Asra International); AR-0722 (internal agency memorandum describing sales of car audio and video equipment).  OFAC found that five of those transactions post-dated the January 26, 2012 cautionary letter OFAC issued to Power Acoustik.  See AR-0313 (describing documentation for shipments to Asra International in March and June 2012); AR-0727 (internal agency memorandum discussing base penalty calculation based on number of "nonegregious" and "egregious" violations).

OFAC did not find any direct evidence that the plaintiff's shipments to Asra International in Dubai subsequently made their way into Iran, AR-0726; however, OFAC did locate an

English-language website for Asra International which indicated, in OFAC's determination, that Asra International, and an affiliated entity named Asra Electronic Trading Co., distributed car audio and video products in Iran, see, e.g., AR-0007 ("About Us" web page discussing "Asra Trading Company['s]" "10 long years of experience [i]n Iran's car audio & video market"); AR-0009 ("Contact Us" web page listing an address in Dubai, United Arab Emirates, for Asra International Corporation L.L.C., and an address in Tehran, Iran, for Asra Electornic [sic] Trading Co.); AR-0010–16 (web pages listing addresses for dealers located in Iran). OFAC also discovered that the address on the airway bill for the 2008 shipment from Power Acoustik to Iran was the same address in Tehran listed on Asra International's "Contact Us" web page. AR-0724; compare AR-0001 (airway bill) with AR-0009 ("Contact Us" web page).

OFAC further determined, from a gallery of photographs on the Asra International website, that Asra International distributed "Sound Stream" products in Iran, and that "Sound Stream" is one of the plaintiff's business brands. See AR-0019–68 (photographs of Sound Stream products on the Asra International website); AR-0721 (internal agency memorandum describing the plaintiff as a "closely-held car electronics company in California" that "operates under multiple names, including . . . Sound Stream"). OFAC also located a web page for Sound Stream that appeared to display some of the same photographs OFAC found on the Asra International website. AR-0723 (internal agency memorandum describing Sound Stream's archived website).

In light of the evidence it had collected, OFAC issued a pre-penalty notice that set forth its findings, concluding that the plaintiff had violated the Regulations, and listing a "base penalty" of $4,073,000, based on 34 nonegregious violations, i.e., transactions that took place prior to the January 26, 2012 cautionary letter from OFAC to Power Acoustik, and five

egregious violations, i.e., transactions that took place after the cautionary letter.  See AR-0737–38 (charts attached to OFAC's pre-penalty notice detailing dates and penalties for each violation).  The pre-penalty notice informed the plaintiff that it had a right to respond in writing within 30 days.  AR-0735–36.

The plaintiff responded to the pre-penalty notice, stating that OFAC failed to provide any evidence that the goods at issue "were in fact shipped to Iran, nor any evidence that [the plaintiff] knew or had reason to know that the goods were specifically intended for Iran."  AR-0739, AR-0741.  The plaintiff disclaimed any knowledge of the photographs on Sound Stream's website appearing to show the plaintiff's products in Iran "[because] the owners and managers of [the plaintiff] do not handle the maintenance of their website," but stated that the website "may include flags for some countries in which they do not in fact sell their products, in an effort to promote their company by giving the appearance that they have a widespread global presence, in order to remain competitive with the major players in the electronics market."  AR-0741.

OFAC issued a final penalty notice in July 2014 sustaining the findings and penalties outlined in the pre-penalty notice and requiring the plaintiff to pay a civil penalty of $4,073,000.  AR-0747–48; see also AR-744 (internal agency memorandum stating, in regard to the plaintiff's response to the pre-penalty notice, that "Epsilon's unsubstantiated arguments do not change [OFAC] Enforcement's assessment of the case . . . .").  The plaintiff then initiated this lawsuit.

## II.    STANDARD OF REVIEW

In cases seeking judicial review of agency action under the Administrative Procedure Act ("APA"), "[s]ummary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review."  Loma Linda Univ. Med. Ctr. v. Sebelius, 684 F. Supp. 2d 42, 52 (D.D.C.

6

2010) (citing Stuttering Found. of Am. v. Springer, 498 F. Supp. 2d 203, 207 (D.D.C. 2007)),

aff'd, 408 F. App'x 383 (D.C. Cir. 2010).  The APA requires that a court reviewing agency

action "shall review the whole record or those parts of it cited by a party."  5 U.S.C. § 706.  "It is

a widely accepted principle of administrative law that the courts base their review of an agency's

actions on the materials that were before the agency at the time its decision was made."  IMS,

P.C. v. Alvarez, 129 F.3d 618, 623 (D.C. Cir. 1997).  Due to the limited role of a court in

reviewing agency action based on the administrative record, the typical summary judgment

standards set forth in Federal Rule of Civil Procedure 56 do not apply.  See Stuttering, 498 F.

Supp. 2d at 207.  Instead, "[u]nder the APA, it is the role of the agency to resolve factual issues

to arrive at a decision that is supported by the administrative record, whereas 'the function of the

district court is to determine whether or not as a matter of law the evidence in the administrative

record permitted the agency to make the decision it did.'"  Id. (quoting Occidental Eng'g Co. v.

Immigration & Naturalization Servs., 753 F.2d 766, 769–70 (9th Cir. 1985)).  Thus, "when a

party seeks review of agency action under the APA, the district judge sits as an appellate

tribunal," and "[t]he entire case on review is a question of law."  Am. Bioscience, Inc. v.

Thompson, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (quotation marks omitted).

### III.    ANALYSIS

#### A.  The Plaintiff's APA Claims

The plaintiff contends OFAC's determinations should be vacated pursuant to Section

706(2)(A), (B), (E), and (F) of the APA, 5 U.S.C. §§ 706(2)(A), (B), (E), (F).  Pl.'s Mem. at 6–7.

"The APA's scope of review provisions are cumulative, and section 706(2)(A)—concerning

conduct that is 'arbitrary, capricious, an abuse of discretion or otherwise not in accordance with

law'—is 'a catchall, picking up administrative conduct not covered by other more specific

paragraphs.'"  Office of Foreign Assets Control v. Voices in the Wilderness, 382 F. Supp. 2d 54, 59 (D.D.C. 2005) (citing Ass'n of Data Processing Serv. Orgs. v. Bd. of Governors of the Fed. Reserve Sys., 745 F.2d 677, 683 (D.C. Cir. 1984)).

Under the arbitrary and capricious standard, the Court does not undertake its own fact-finding, rather, the Court must review the administrative record as assembled by the agency. Camp v. Pitts, 411 U.S. 138, 142 (1973).  This review is highly deferential to the agency, see Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977); Holy Land Found. for Relief and Dev. v. Ashcroft, 333 F.3d 156, 162 (D.C. Cir. 2003), and thus, "there is a presumption in favor of the validity of [the] administrative action," Bristol–Myers Squibb Co. v. Shalala, 923 F. Supp. 212, 216 (D.D.C. 1996).  Moreover, if the "agency's reasons and policy choices . . . conform to 'certain minimal standards of rationality' . . . the [decision] is reasonable and must be upheld." Small Refiner Lead Phase–Down Task Force v. Envtl. Prot. Agency, 705 F.2d 506, 521 (D.C. Cir. 1983) (citation omitted).  In reviewing agency action, courts must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment," Overton Park, 401 U.S. at 416, and courts will not overturn an agency's "choice of sanctions unless they are either 'unwarranted in law or . . . without justification in fact.'"  Pharaon v. Bd. of Governors of the Fed. Reserve Sys., 135 F.3d 148, 155 (D.C. Cir. 1998) (quoting Bluestone Energy Design, Inc. v. Fed. Energy Regulatory Comm'n, 74 F.3d 1288, 1294 (D.C. Cir. 1996)).

When reviewing agency decisions in the area of foreign relations, courts must be mindful that "[m]atters related 'to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or inference.'"

Regan, 468 U.S. at 242 (quoting Harisiades v. Shaughnessy, 342 U.S. 580, 589 (1952)).  Thus, "[a]s a general principal, . . . [a reviewing court] should avoid impairment of decisions made by the Congress or the President in matters involving foreign affairs or national security."  Glob. Relief Found. v. O'Neill, 207 F. Supp. 2d 779, 788 (N.D. Ill. 2002) (citing Haig v. Agee, 453 U.S. 280, 292 (1981)).  Accordingly, a review of a decision made by OFAC is "extremely deferential" because OFAC operates "in an area at the intersection of national security, foreign policy, and administrative law."  Islamic Am. Relief Agency v. Gonzales, 477 F.3d 728, 734 (D.C. Cir. 2007).

Here, the plaintiff lodges several challenges to OFAC's determination that the plaintiff violated the Regulations and to the penalty OFAC imposed, which the Court will address in turn below, guided by the principles of judicial review of agency action set forth above.

### 1.   The "Inventory Exception" and Asra International's Activities in Iran

Based on an OFAC guidance document, the plaintiff argues that OFAC has traditionally allowed "transshipment of goods to Iran when the items are not sold to [a] third-country party for the specific purpose of being reexported to Iran and the third-country party's sales are not predominantly to a sanctions target," the so-called "inventory exception."  Pl.'s Mem. at 11–12 (citing OFAC's Guidance on Transshipments to Iran, www.treasury.gov/resource-center/sanctions/programs/documents/iranship.pdf (last visited Feb. 8, 2016)).  The plaintiff's reliance on this guidance document is misguided, because the guidance simply does not support the plaintiff's position.  The guidance states that

> prohibited sales to Iran through a non-U.S. person in a third country are not limited to those situations where the seller has explicit knowledge that the goods were specifically intended for Iran, but includes those situations where the seller had reason to know that the goods were specifically intended for Iran, including when the third party deals exclusively or predominantly with Iran or the Government of Iran.

"Reason to know" that the seller's goods are intended for Iran can be established through a variety of circumstantial evidence, such as: course of dealing, general knowledge of the industry or customer preferences, working relationships between the parties, or other criteria far too numerous to enumerate . . . .

A violation involving indirect sales to Iran may be based upon the actual knowledge of the U.S. supplier at the time of its sale, or upon determination that the U.S. supplier had reason to know at the time of sale that the goods were specifically intended for Iran.  OFAC would consider all the relevant facts and circumstances in order to determine the actual or imputed knowledge on the part of the U.S. supplier.

Guidance on Transshipments to Iran at 2.

Relying on its understanding of the guidance, the plaintiff contends that "OFAC failed to consider that Asra in the [United Arab Emirates] is a separate and distinct business from Asra in Iran and that Epsilon did no business with Asra in Iran."  Pl.'s Mem. at 9.  But there is ample evidence in the record to contradict this position.  As OFAC found, Asra International's website listed addresses on its "Contact Us" page for one location in Dubai, United Arab Emirates, and one location in Tehran, Iran.   AR-0009.  And the website's "About Us" page touted Asra International's success in the Iranian car audio and video market and listed dealers located exclusively in Iran.  AR-0007.  The website also displayed photographs of what appeared to be car shows in various Iranian cities.  AR-0019–68.  Furthermore, the plaintiff's assertion that there is no "concrete evidence that Epsilon could have known what percentages of Asra's sales were made to Iran compared with other countries," Pl.'s Reply at 5, is plainly unsupported by the record, because OFAC's investigation discovered facts showing that during the relevant timeframe, it appeared that Asra International was doing business "exclusively or predominantly" in Iran, see AR-0722, AR-0726 (discussing the Asra International website's references to Iran and concluding that Asra International "appears to be a company that was distributing exclusively in Iran"); Guidance on Transshipments to Iran at 2 ("prohibited sales to

Iran through a non-U.S. person in a third country . . . includes those situations where the seller had reason to know that the goods were specifically intended for Iran, including when the third party deals exclusively or predominantly with Iran . . . ."). The Court finds no fault with OFAC's conclusion based on this evidence, which shows that the plaintiff had reason to know that Asra International distributed car and audio equipment in Iran during the time period when the plaintiff was sending shipments to Asra International.

The plaintiff relies on certain correspondence in the administrative record in an attempt to undermine OFAC's determination that Asra International distributed products primarily in Iran during the timeframe when the plaintiff was doing business with Asra International. See Pl.'s Mem. at 12. The plaintiff contends that this correspondence shows Asra International's "intent to distribute Epsilon's products in several countries other than Iran and that Asra had a large export business with many other countries." Pl.'s Mem. at 12; see also Pl.'s Reply at 6–7 (stating that the correspondence "clearly indicate business in several other countries" and "outline the objectives for these products being sold in countries other than Iran"). The correspondence do not command rejection of OFAC's determination, because, at best, they show that Asra International may have had some limited distribution in countries other than Iran, and in any event, the correspondence occurred at some point after the plaintiff became aware of OFAC's investigation. See AR-0642 (March 2012 email from Asra International representative regarding potential purchase of window screens, stating that "Dubai [is] very hot in the summer and we need something hot outside and cold inside"); AR-0647 (March 2012 email from Asra International representative stating that "[w]e already started marketing in this region and we have lots of people from tajikestan-uzbekistan-Jordan-some african [sic] countries but unfortun[ate]ly there is nothing to display"); AR-0661 (April 2012 email from Asra International

representative complaining about another "shop in Dubai" selling the plaintiff's products).  The

plaintiff's arguments are unpersuasive in light of the substantial evidence OFAC had before it to

determine that, during the relevant time period, the plaintiff had reason to know that Asra

International's dealings were primarily in Iran.  The Court therefore concludes that OFAC's

determination that the plaintiff violated the Regulations, through its business dealings with Asra

International, was reasonable based on ample evidence in the record.

### 2.  Egregious Violations

The plaintiff next argues that the five transactions post-dating the January 26, 2012

cautionary letter should not have been deemed to be "egregious" violations for purposes of

calculating the base penalty amount.  Pl.'s Mem. at 11; see also AR-0737–38 (charts in OFAC's

pre-penalty notice detailing base penalty calculation for each violation).  OFAC's enforcement

guidelines state that in "cases in which a civil monetary penalty is deemed appropriate, OFAC

will make a determination as to whether a case is deemed 'egregious' for purposes of the base

penalty calculation" 31 C.F.R. pt. 501, App. A, § V.B.1, and that this determination is based on

the enumerated General Factors contained in the guidelines, see id. § III (setting forth General

Factors (A)–(K)).  "In making the egregiousness determination, OFAC generally will give

substantial weight to General Factors A ('willful or reckless violation of law'), B ('awareness of

conduct at issue'), C ('harm to sanctions program objectives')[,] and D ('individual

characteristics'), with particular emphasis on General Factors A and B."  Id. § V.B.1.

The plaintiff primarily challenges OFAC's determination as to the five egregious

violations on the ground that the dollar amount of goods shipped in those five transactions was

"minor," see Pl.'s Mem. at 11 ("Two of the five 'egregious' transactions were for under $150.00,

two were for under $5,400, and only one was for roughly [$]26,000"), and therefore the

imposition of a $250,000 fine for each transaction is "certainly . . . arbitrary and capricious" and "not supported by any rational basis, but rather by disparate and inferential conclusions," id.; see also Pl.'s Reply at 5 ("Based on the facts provided in the Administrative Record, the value of the so-called 'egregious' violations certainly did not significantly harm the Iranian sanctions program, if at all.").  The Court cannot agree with this position either.

OFAC's enforcement guidelines state that, "[i]n an egregious case, if the apparent violation comes to OFAC's attention by means other than a voluntary self-disclosure," as was the case here, "the base amount of the proposed civil penalty . . . shall be the applicable statutory maximum penalty amount applicable to the violation."  31 C.F.R. pt. 501, App. A, § V.B.2.a.iv. And, under the IEEPA, the applicable statutory maximum is $250,000.  50 U.S.C. § 1705(b). The plaintiff expressly "does not dispute fines that are fixed by their structure," Pl.'s Mem. at 10, and OFAC clearly adhered to the letter of its enforcement guidelines in calculating the penalty for the egregious violations.  In addition, while the volume of transactions at issue is relevant to General Factor D, 31 C.F.R. pt. 501, App. A, § III.D.3, the guidelines are also explicit that OFAC is to give "particular emphasis" to General Factors A (willful or reckless violation of the law) and B (awareness of the conduct at issue), id. V.B.1.  Given that "an agency's interpretation of one of its own regulations commands substantial judicial deference," Drake v. Fed. Aviation Admin., 291 F.3d 59, 68 (D.C. Cir. 2002); see also Auer v. Robbins, 519 U.S. 452, 461 (1997) (agency's interpretation of own regulations controls unless plainly erroneous), the Court rejects the plaintiff's position that OFAC's decision to impose the maximum statutory penalty for each of the five transactions that occurred after it cautioned the plaintiff about the legality and potential consequences of making shipments to Iran is arbitrary or capricious, or that it lacks a rational basis.  The Court turns next to the plaintiff's challenges regarding OFAC's application

of mitigating factors.

### 3.  Mitigating Factors

The plaintiff also argues that OFAC failed to consider certain facts as mitigating factors that should have reduced the civil penalty OFAC imposed.  Pl.'s Mem. at 8–9.  Consistent with its enforcement guidelines, OFAC considered several factors when determining whether to depart from the statutory base penalty.  See AR-0731 (internal agency memorandum summarizing recommendations for pre-penalty notice); 31 C.F.R. pt. 501, App. A, § V ("OFAC will . . . apply the General Factors . . . in determining the amount of any civil monetary penalty"). Based on its factual findings, OFAC identified three mitigating factors: (1) the plaintiff's eligibility for a "25% 'first offense' mitigation," (2) the plaintiff's status as a small business, and (3) the plaintiff provided "some cooperation to OFAC, including entering into an agreement to toll the statute of limitations."  AR-0731.  On the other hand, OFAC identified seven aggravating factors, namely: (1) the plaintiff acted with reckless disregard toward the Iran sanctions program, (2) the plaintiff attempted to conceal its violations, (3) the repeated pattern of violations, (4) the plaintiff sent five shipments to Iran despite having received the January 26, 2012 cautionary letter; (5) the value of the 39 transactions at issue totaled over $3 million; (6) the plaintiff had no program in place to ensure compliance with the Regulations; and (7) the plaintiff attempted to mislead OFAC.  Id.

The plaintiff contends that OFAC should have given greater weight to the plaintiff's lack of commercial sophistication and its cooperation with OFAC's investigation.  See Pl.'s Mem. at 9–10.  The defendants respond that OFAC "explicitly weighed these considerations in arriving at the appropriate penalty amount," Defs.'s Reply at 7, and indeed, the record bears this out, see AR-0731 (identifying, as mitigating factors, the plaintiff's status as a small business and

cooperation with OFAC).  And, although the plaintiff provided responses to OFAC's subpoena,

OFAC had concerns about the plaintiff's stated inability to provide email records prior to

September 2011, allegedly due to a computer crash, in light of the fact that OFAC's first

subpoena for the plaintiff's records (regarding the 2008 shipment by Power Acoustik to an

address in Iran) was issued in August 2011.  AR-0730; see AR-0698–99 (May 2013 letter from

the plaintiff to OFAC explaining the circumstances surrounding the loss of email records).

Weighing all the General Factors, OFAC concluded that "[t]hese factors taken together

support a net zero percent aggravation/mitigation from the base penalty amount."  AR-0731.

Given that OFAC identified 7 aggravating factors and only 3 mitigating factors, and essentially

considered these factors to cancel each other out, there is no basis to find that OFAC improperly

weighed the mitigating factors to the plaintiff's detriment.  See Overton Park, 401 U.S. at 416

(upon review of agency action, the court considers "whether the decision was based on a

consideration of the relevant factors and whether there has been a clear error of judgment").  The

Court concludes OFAC's weighing of the aggravating and mitigating factors surpasses "minimal

standards of rationality," Small Refiner, 705 F.2d at 521, and must therefore be upheld as a

reasonable application of OFAC's enforcement guidelines.

### B.  The Plaintiff's Fifth Amendment Claims

The Fifth Amendment provides that no person may "be deprived of life, liberty, or

property, without due process of law."  U.S. Const. amend. V.  "The fundamental requirement of

[procedural] due process is the opportunity to be heard 'at a meaningful time and in a meaningful

manner.'"  Mathews v. Eldridge, 424 U.S. 319, 333 (1976) (quoting Armstrong v. Manzo, 380

U.S. 545, 552 (1965)).  "Procedural due process rules are meant to protect persons not from the

deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property."  Carey

v. Piphus, 435 U.S. 247, 259 (1978).  "[D]ue process is flexible and calls for such procedural

protections as the particular situation demands."  Morrissey v. Brewer, 408 U.S. 471, 481 (1972).

To support its due process argument, the plaintiff first contends that OFAC's pre-penalty

notice "failed to specify the basis for the penalty assessment" and that as a result, it "did not

receive adequate notice of OFAC's position that several items and shipments were to thereafter

labeled egregious for penalty calculations that were exorbitant."  Pl.'s Mem. at 16.  Contrary to

this assertion, the pre-penalty notice set forth the transactions at issue, the specific regulatory

basis for OFAC's findings, listed each transaction and its associated penalty calculations in two

charts—one for violations OFAC designated nonegregious and a separate chart for egregious

violations.  See AR-0733 (describing 39 invoices that formed the basis for OFAC's

determination that the plaintiff violated 31 C.F.R. § 506), AR-0734 (identifying which

transactions would be treated as nonegregious or egregious), AR-0737 (listing each nonegregious

violation and the associated base penalty), AR-0738 (listing each egregious violation and the

associated base penalty). The plaintiff's first due process argument is therefore patently baseless.

The plaintiff also takes issue with the January 26, 2012 cautionary letter, stating that the

letter "put Epsilon on notice that OFAC was inquiring only of non-egregious shipments."  This

argument is a nonstarter.  The cautionary letter explicitly warned the plaintiff that the 2008

shipment of spare parts by Power Acoustik to an address in Iran appeared to violate the

Regulations, and that the Regulations "prohibit virtually all direct or indirect commercial

financial or trade transactions with Iran" unless otherwise authorized.  AR-0006.  The need to

exercise caution notwithstanding, the plaintiff proceeded to send additional shipments to Asra

International, which OFAC later reasonably determined were made while the plaintiff had reason

to know that Asra International was distributing products predominantly in Iran.  AR-0727–28;

see supra Part III.A.  These transactions were addressed in the pre-penalty notice, see AR-0733–

38, to which the plaintiff had an opportunity respond, see AR-0739–41.  The plaintiff's second

due process challenge must therefore also fail.

The plaintiff next argues that OFAC's issuance of the final penalty notice "deprived [the

plaintiff] of actual notice and a bona fide opportunity to adequately respond to OFAC's

subpoenas."  Pl.'s Mem. at 17.  The timeline of OFAC's investigation of the transactions at issue

in this case belies this contention.  OFAC issued its first administrative subpoena in December

2011, AR-0072–74, to which the plaintiff responded in January 2012, AR-0070–71.  OFAC

issued a second administrative subpoena in May 2012, AR-0316–20, to which the plaintiff

responded in July 2012, AR-0311–15.  Each subpoena plainly put the plaintiff on notice that

OFAC was closely scrutinizing its dealings with Asra International.  See AR-0072 (seeking

documents and information regarding payments made by the plaintiff to Asra International); AR-

0318 (same).  Almost two years later, on May 6, 2014, OFAC issued its pre-penalty notice,

which informed the plaintiff that it had 30 days to provide a written response to the pre-penalty

notice.  AR-0733, AR-0735.  The plaintiff provided a two-page response to the pre-penalty

notice on June 6, 2014, AR-0739–40.  This series of events shows that the plaintiff had ample

opportunity to respond to OFAC's inquiries into its dealings with Asra International and to

OFAC's detailed pre-penalty notice.  Procedural due process demands nothing more.  E.g., Holy

Land Found., 333 F.3d at 165–64 (notice and opportunity to make written submissions to OFAC

satisfied due process); cf. Nat'l Council of Resistance of Iran v. Dep't of State, 251 F.3d 192,

209 (D.C. Cir. 2001) (noting that, in the context of OFAC's designation of foreign terrorist

organizations, notice and "opportunity to present, at least in written form, such evidence as those

entities may be able to produce to rebut the administrative record or otherwise negate" the

designation constitutes sufficient opportunity to be heard).  The plaintiff's Fifth Amendment due process claims are therefore meritless.

### C.  The Plaintiff's Eighth Amendment Claims

The plaintiff argues that the $4,073,000 civil penalty is "grossly disproportionate to the gravity of the offenses" and thus "directly violate[s] the Eight Amendment."  Pl.'s Reply at 7; see generally Pl.'s Mem. at 14–16.   The Eight Amendment prohibits, among other things, the imposition of excessive fines by the government.  U.S. Const. amend. VIII; see United States v. Bajakajian, 524 U.S. 321, 328 (1998) ("The Excessive Fines Clause thus 'limits the government's power to extract payments, whether in cash or in kind, as punishment for some offense.'" (quoting Austin v. United States, 509 U.S. 602, 609–10 (1993))).   "The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish."  Bajakajian, 524 U.S. at 334.  Thus, a fine violates the Eighth Amendment "if it is grossly disproportionate to the gravity of a defendant's offense."  Id.

OFAC determined that the plaintiff had violated the Regulations' ban on trade with Iran to the tune of over $3.4 million over a four-year time frame.  AR-0733.  The potential maximum penalty, which is based on penalties established by Congress in the IEEPA, 50 U.S.C. § 1705, was over $12.8 million, AR-0727; see also Collins v. Sec. & Exch. Comm'n, 736 F.3d 521, 527 (D.C. Cir. 2013) (noting the Supreme Court's "admonition that, though this is a constitutional inquiry, 'judgments about the appropriate punishment for an offense belong in the first instance to the legislature'" (quoting Bajakajian, 524 U.S. at 336)).  OFAC explains that the plaintiff's "conduct contributed more than $3.4 million of normal trade to the Iranian economy, enriching Iran with U.S. business and consumer goods" which "directly counter the United States' efforts

18

to motivate Iran to change its policies through restricting its access to American trade."   Defs.'

Reply at 9; see also AR-0729 (internal agency memorandum stating that the "harm to U.S. policy

was significant, since these transactions were ongoing (four years) and involved a cumulatively

high value of goods").   The civil penalty imposed on the plaintiff is approximately one-third of

the potential statutory maximum, and under this Circuit's precedents, such a fine does not violate

the Eighth Amendment.  Pharaon, 145 F.3d at 156–57 (upholding agency's penalty

determination where it was "well below" the statutory maximum); Duckworth v. United States,

705 F. Supp. 2d 30, 48 (D.D.C. 2010) (rejecting plaintiffs' excessive fine claim because fines

imposed were "well within the range allowed by" applicable statute), aff'd, 418 F. App'x 2 (D.C.

Cir. 2011).  Under these circumstances, the Court cannot conclude that the $4,073,000 civil

penalty is grossly disproportionate to the gravity of the plaintiff's repeated violations of United

States sanctions against Iran.[2]

---

[2] The plaintiff also argues that it risks bankruptcy if it is required to pay the civil penalty, and therefore, OFAC should render the same treatment it gave to another company upon which OFAC recently imposed a penalty.  Pl.'s Mem. at 15 (citing OFAC, Enforcement Information for July 29, 2015, www.treasury.gov/resource-center/sanctions/civpen/documents/20150729_blue_robin_pdf (last visited Feb. 8, 2016) (hereinafter, the "Blue Robin case")).  Although it raises this argument as part of its Eighth Amendment challenge, the claim of disparate treatment is more appropriately considered a challenge to whether the amount of the civil penalty violates the APA.  In this Circuit, "[r]eview for whether an agency's sanction is arbitrary or capricious requires consideration of whether the sanction is out of line with the agency's decisions in other cases."  Collins, 736 F.3d at 526 (citing Friedman v. Sebelius, 686 F.3d 813, 827–28 (D.C. Cir. 2012)).  The Blue Robin case cited by the plaintiff as support for its position is easily distinguished from the circumstances here.  OFAC concluded that Blue Robin violated the Regulations when it imported services valued at over $200,000 from an Iranian company.  Enforcement Information for July 29, 2015.  The base penalty amount was $102,825, and OFAC imposed a penalty of $82,260.  Id.  Among the mitigating factors OFAC identified was that Blue Robin "is a small business that claims to be suffering financial difficulties."  Id.  In this case, the transactions at issue totaled over $3.4 million.  See AR-0737–38 (listing each transaction at issue and totaling their value).  OFAC acknowledged that the plaintiff was a small business, see AR-0735 (listing mitigating factors in pre-penalty notice provided to the plaintiff), and it does not appear from the record before the Court that the plaintiff raised any "financial difficulties" in its response to the pre-penalty notice, see generally AR-0739–41.  Given the distinctions between this case and the Blue Robin case, the Court is not persuaded that OFAC's actions in the Blue Robin case demonstrate that its sanction here was arbitrary or capricious.  And in any event, as another member of this Court has noted, agencies "are not required to impose penalties that can be easily paid out of pocket."  Duckworth, 705 F. Supp. 2d at 50.

  Further, to the extent the plaintiff contends that OFAC's disparate treatment of Blue Robin constitutes a violation of the equal protection component of the Fifth Amendment, such an argument must fail because the plaintiff has not asserted discrimination on the basis of race, alienage, or natural origin.  See generally Texas Border Coalition v.

(continued . . . )

The plaintiff's attempt to attenuate the gravity of the offense, by pointing to the designation of car and audio equipment as "non-sensitive" goods under the Export Administration Regulations, is also unpersuasive.  See Pl.'s Mem. at 14–15 (arguing that sale of items that are not of a sensitive nature under the Export Administration Regulations does no harm to the United States sanctions regime).  The defendants respond that the designation of goods as sensitive or non-sensitive under the Export Administration Regulations is irrelevant to the gravity of the plaintiff's offense, Defs.' Reply at 9, and the Court must agree.  It is true that the Export Administration Regulations, which are promulgated by the Bureau of Industry and Security, a component of the United States Department of Commerce, "relat[e] to the control of certain exports, reexports, and activities" prohibited, in part, by the IEEPA.  15 C.F.R. § 730.1; see id. § 730.2 ("There are numerous other legal authorities underlying the [Export Administration Regulations]," including 50 U.S.C. § 1701).  Separately, the Regulations, promulgated by OFAC and Treasury, specifically bar virtually all trade of goods or services with Iran, irrespective of the nature of the goods or services, absent explicit authorization by OFAC or by statute.  See 31 C.F.R. § 560.204 ("Except as otherwise authorized . . . , the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran . . . is prohibited . . . .").  The Court can find no indication in the Regulations that there are exceptions to this broad prohibition tied in some way to the Export Administration Regulations, and the plaintiff has not

---

( . . . continued)

Napolitano, 614 F. Supp. 2d 54, 65 (D.D.C. 2009) (Walton, J.) (explaining that "the Fifth Amendment's guarantee of equal protection mirrors the equal protection rights provided by the Fourteenth Amendment," and that "[i]n the absence of any claims of distinction having been made based on 'race, alienage, or natural origin . . . '[t]he general rule is that legislation is presumed to be valid and will be sustained if the classification drawn . . . is rationally related to a legitimate state interest." (alteration in original) (quoting City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 440 (1985))).

pointed to any such connection.  Indeed, the Export Administration Regulations themselves recognize that other agencies, including OFAC, have jurisdiction over "certain narrower classes of exports and reexports."  15 C.F.R. § 730.4; <u>see</u> <u>id.</u> (stating that OFAC "administers controls against certain countries that are the object of sanctions affecting not only exports and reexports, but also imports and financial dealings").  The Court, having already concluded that the $4,073,000 civil penalty is not grossly disproportional to the plaintiff's violation of United States sanctions against Iran, does not find the Export Administration Regulations to have any bearing on the plaintiff's violations of the Regulations.  The Court must therefore grant the defendants' motion for summary judgment with respect to the plaintiff's Eighth Amendment claims.

## CONCLUSION

For the reasons stated above, the Court shall grant the defendants' motion for summary judgment, and deny the plaintiff's cross-motion for summary judgment.[3]

**SO ORDERED** this 7th day of March, 2016.

REGGIE B. WALTON
United States District Judge

---

[3] The Court shall contemporaneously issue an Order consistent with this Memorandum Opinion.